**MOBILE COUNTY JAIL INMATES,**
**Plaintiffs,**

v.

**Thomas J. PURVIS, etc., et al., Defendants.**

**Civ. A. No. 76–416.**

United States District Court,
S.D. Alabama, S.D.

Nov. 15, 1982.

J.U. Blacksher, Blacksher, Menefee & Stein, Mobile, Ala., for plaintiffs.

James C. Wood, Simon & Wood, Mobile, Ala., for defendants Mobile County Com'rs.

Roderick P. Stout, Stout, Roebuck & Hallett, Mobile, Ala., for defendant Sheriff Thomas J. Purvis.

ORDER SUPPLEMENTING THIS COURT'S ORDER DATED OCTOBER 29, 1982 HOLDING THE DEFENDANTS IN CONTEMPT OF THE COURT'S PREVIOUS ORDERS

PITTMAN, District Judge.

On October 29, 1982, following a hearing, a brief written order was entered holding the defendants in contempt of court. That order stated, "This court within the next few days will enter a more complete order." This is that more complete order.

This matter is before the court on the motion of the plaintiffs, Mobile County Jail Inmates, that the defendants, Dan Wiley, Douglas Wicks and William Hays, in their official capacities as Commissioners of Mobile County, and defendant, Thomas J. Purvis, in his official capacity as Sheriff of Mobile County, be held in civil contempt for failure to comply with the inmate population limitations of this court's Injunctive Order of April 27, 1981.

Following protracted litigation concerning the conditions of the Mobile County Jail, this court found, in its Opinion and Order dated April 24, 1981, that the totality of the circumstances and conditions of confinement at the Mobile County Jail amounted to punishment of the pretrial detainees confined there, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 (1976). The court further found that the totality of circumstances and conditions of confinement amounted to cruel and unusual punishment of all inmates confined therein, in violation of the Eighth Amendment of the United States Constitution and 42 U.S.C. § 1983 (1976). *Mobile County Jail Inmates v. Purvis*, No. 76–416 (S.D.Ala. Apr. 24, 1981).

In its Injunctive Order dated April 27, 1981, the court, pursuant to such findings, directed the defendants to make significant changes at the Mobile County Jail with respect to inmate population, supervision, health care, standard operating procedures, modifications to facilities, and training.

The specific issue presently before the court concerns inmate population.[1] In its

---

1. At the time of the entry of the court's Opinion and Order, the court made the following conclusions with respect to the overcrowded conditions at Mobile County Jail:

"The degree of *overcrowding* at the Mobile County Jail is remarkable and *unacceptable.* Public health and correctional standards provide a useful point of comparison. The American Public Health Association standards require single cells or 60 square feet and 500 cubic feet per person. Dormitories, although they are strongly disfavored, should provide 75 square feet and 600 cubic feet per person. The [American Correctional Association] standards require 60 square feet per cell and 80 square feet per inmate per cell for those confined more than ten hours a day. Fifty square feet per person are required in dormitories. Other nationally recognized standards prescribe 70 or 80 square feet per person. In contrast, *actual space allotments* at the Mobile County Jail *rarely even reach half that required by the various standards.* There is *only* an average of *27 square feet per person,* or less, at the Mobile County Jail. In the 24-man dormitory style cells there is an average of only 23 square feet per person. In the 24-man cell block type cells there is an average of slightly less than 24 square feet per person. In the 12-man cells, the square footage per person averages slightly less than 24 square feet; 24 square feet in the 12-man trustee cells. Cell 301, a 6-man cell, provides 28 square feet per person. The isolation and the solitary cells each provide approximately 38 square feet. All of *these figures indicate total space at capacity.* However, even when an individual cell at the jail is below capacity the square footage per person remains far below that required by the standards. For example, Cell 202, the intake evaluation cell, may at times hold fewer than the 12 inmates it was designed for. When Cell 202 holds 18 individuals, as has happened, only 14 square feet per person is provided. Moreover, it should be pointed out that the above noted figures are total space. *The various standards require additional dayroom space*—35 square feet per inmate according to the ACA standards and an additional 50% living space according to the APHA standards. The Mobile County Jail provides *no such dayroom space.* Thus, it is not a question of whether the Mobile County Jail meets correctional and other standards which may not be constitutionally compelled. The degree of overcrowding at the Mobile County Jail is so great that space allotments *rarely exceed even 30% of the expert recommendations.* As a result, the court cannot but conclude that the inmates at the Mobile County Jail suffer all of the deleterious effects of overcrowding that have been documented by these standards, general experience in corrections, and the expert testimony given in this

Opinion and Order of April 24, 1981, the court found that "[o]vercrowding is the root and basic problem" contributing to the deplorable physiological and psychological effects of the Mobile County Jail, and stressed the importance of alleviating overcrowding to the improving of overall conditions at Mobile County Jail:

> Overcrowding is a complex phenomenon which has many complications and ramifications in a setting such as the Mobile County Jail. The court has previously discussed the relationship between the degree of overcrowding in the jail and the incidence of violence resulting from the increased frustrations and tensions of enforced close contact. The degree of overcrowding in the particular facilities of the Mobile County Jail also contributes to the breakdown of a rational classification system which would be necessary in that facility in order to provide any semblance of protection from violence. There was undisputed expert testimony regarding the physiological effects of overcrowding, which results in increased blood pressure after 14 days and, after a period of latency, further increased blood pressure after one month. There was also expert testimony regarding the effect of overcrowding on over-utilization of medical services. Additionally, the overcrowding in the Mobile County Jail further taxes the already meager staff and the extremely limited space for visitation and outdoor exercise, the only programs in existence at the jail.

Opinion and Order, at 21–22.

The court also noted that the overcrowding and lack of adequate space in the Mobile County Jail has serious health implications for the institution and the community in which it is located. The intrusion of an individual's "personal space" or "portable territory" occasioned by overcrowding may also elicit physical and social stress reactions, including violence, aggression, and defense of territory. Thus, as part of the

case." (Emphasis added). *Mobile County Jail Inmates v. Purvis*, No. 76–416 (S.D.Ala. Apr.

April 27, 1981 Injunctive Order, the court directed that:

> [T]he defendants Mobile County, Alabama; G. Bay Haas, Jeff Mims, and Dan Wiley, individually and in their official capacities as Commissioners of Mobile County, Alabama; Thomas J. Purvis, individually and in his official capacity as Sheriff of Mobile County, Alabama; their successors, agents, servants or employees; and any persons acting in concert with any of them, are hereby ENJOINED from failing to implement the terms of this order as follows:

### INMATE POPULATION

The total number of non-state inmates (pre-trial detainees and convicted misdemeanants) shall not exceed the the (sic) following numbers as of the dates specified:

| | |
|---|---|
| September 1, 1981 | 225 |
| January 1, 1982 | 175 |
| May 1, 1982 | 125 |

This order was not appealed. On December 23, 1981, the defendants petitioned the court to modify its order by extending the January 1, 1982 non-state jail population of 175 by freezing the non-state inmate population at the September, 1981 level of 225 to May 1, 1982. On January 22, 1982, this court entered an order modifying its April 27, 1981 order by freezing the non-state inmate population at 195 to May 1, 1982 and stated, "It is *imperative that the defendants make strenuous efforts to meet this court's order* of 145 inmates (125 non-state plus 20 state inmates), which provides approximately 47 square feet per inmate...." (Emphasis added).

On April 30, 1982, the defendants filed a motion to extend the jail population limitation of 195 inmates from May 1, 1982 until November 9, 1982, or until such time as the defendants could proceed with the construction of a new county jail facility. On May 27, 1982, the court endorsed the motion

24, 1981) at 23–25.

"granted to July 22, 1982." The first hearing on the motion was held on July 22, 1982, at which time the non-state jail population was 217, in excess of the court's modified order. The timetable for a new jail was estimated to be three or four years. Legislation, voter approval, and a bond issue, as well as planning and construction, would be involved in that time period. The court at that time advised the defendants to take a two-tiered approach to compliance, i.e., to continue with efforts for a long-range solution to overcrowding while taking such measures as would immediately, albeit temporarily, achieve compliance. The court was informed that the defendants were co-operating with a community "Blue Ribbon Committee" searching for a solution to meet these goals and indicating a willingness to follow a two-tiered approach. Each of the defendant *commissioners stated* there would be *sufficient funds available without further legislative action or voter approval to provide short-range relief.*

On September 14, 1982, at the second hearing on the defendants' motion for extension of time, it was reported to the court that the non-state inmate population was 211. The average non-state inmate population for the eight-week period from July 19, 1982 through September 6, 1982 was 206. Of that 206, 35 were Mobile County inmates, and 171, or 83% of the total non-state inmate population, were pretrial detainees. Of those 171 inmates, 43.570% (74.5 inmates) were non-violent and non-drug related pretrial detainees, i.e., not convicted but awaiting trial on non-violent and non-drug or non-controlled substance related cases. These pretrial detainees are *in jail only because of a financial inability to make bail.* Except for the lack of financial resources, they would not have been in jail until convicted and appeals exhausted. Even after finality of conviction the sen-

tence could be only a fine or a probationary sentence. This 43.570% included such offenses as Driving While Intoxicated, Drunkenness, traffic violations and non-support.[2]

At that same hearing, the defendants informed the court of their conclusion that the only solutions were long-range: construction of a new jail or similar facility and renovation of the existing facility. The defendants took the position that these remedies would require legislative and/or voter approval by referendum and offered no realistic hope of substantial reduction of the overcrowding except by the long-range approach.

The extension and modification of the court's prior orders extending the deadline and number of non-state inmates to July 22, 1982 was not further extended and the modification and extension died a natural death on that date, which in effect reinstated the April 27, 1981 order. So that the status of the defendants' obligation would be unmistakably clear, on October 22, 1982, as a housekeeping measure, the court endorsed the April 30, 1982 motion denying further extensions of the maximum county inmate population of 175 after July 22, 1982 and particularly pointed out that the Injunctive Order of April 27, 1981 was reinstated which had set the total non-state inmate population at 125 (original deadline May 1, 1982). An order reflecting such endorsement was duly entered the same day.

On September 14, 1982, plaintiffs filed a Motion for Institution of Civil Contempt Proceedings. Pursuant to said motion, on September 27, 1982, the court entered an order that the defendants show cause why they should not be held in civil contempt of this court for failure to comply with the court's Injunctive Order of April 27, 1981.

**2.** Based upon the inmate Analysis Report, Revised, for the period from January 1, 1982 through June 30, 1982, the court determined that of the pretrial detainees, 43.570% were held for crimes other than violent and drug-related, and controlled substances including marijuana, offenses. Of that 43.570%, 30.064% were held for specified "Non-Violent Crimes", including such charges as D.W.I. (27%), Drunkenness (8%), Forgery (6%), Larceny (30%), Receiving Stolen Property (16%), Violations of Traffic Laws (6%), and Non-support (4%). (Rounded off to nearest % point. These computations are based on the last data furnished to this court by the defendants, to wit: August, 1982.)

On October 29, 1982, a hearing was had on the court's order. From the evidence submitted then and at the previous hearings, and upon careful consideration of this case, and after arguments, the court makes the following findings of fact, to wit:

From January 1, 1982, until this date, the defendants have been in violation of this court's orders, including its order of modification. No evidence has been offered that at any point since January 1, 1982 have the defendants brought the jail population within the applicable population limitation. At the July 22, 1982 hearing, the non-state inmate population was 217, 22 inmates in excess of the modified limitation of 195 inmates. The average non-state inmate population for the period from July 19, 1982 through September 6, 1982 was 206. At the time of the October 29, 1982 hearing on plaintiffs' motion for contempt citations, the non-state inmate population was 170, or 45 inmates in excess of the court's reinstated Injunctive Order of April 27, 1981. This was the first significant reduction since July, 1981 and took place only after a show cause order had been issued and shortly before the hearing.

The court further finds that the defendants have been dilatory and have not been steadfast in their purposes to control and effectuate compliance with this court's orders. Only recently have the defendants taken any positive steps to give immediate and short-term relief, in spite of the fact that this course was discussed at the July 22, 1982 hearing. The court finds that the defendants have had and have sufficient financial resources available to provide minimum security facilities for pretrial (the bulk of the excess) detainees charged with and those convicted of non-violent and non-drug or non-controlled substance offenses and have been able to comply with the court's injunctive order.

The reduction of inmate population at the present Mobile County Jail facility is fundamental to achieving the constitutionally mandated changes detailed in this court's injunctive order. While there has been a reduction in inmate violence due to the reduction heretofore made, the overcrowding which still exists enhances the probability of inmate violence, fire hazards, escape attempts by those who need to be under maximum security, exacerbates unsanitary conditions and promotes the dehumanizing effects of insufficient space per person. · It has facilitated the breakdown of any rational classification scheme and has overtaxed resources and security.

In short, overcrowding was a major cause of the unconstitutional conditions found to exist at the Mobile County Jail.

The court is particularly concerned with the consistently high percentage of the inmates confined in the Mobile County Jail who are pretrial detainees. This class represents persons who are incarcerated but have not been tried and convicted for the alleged acts for which they are detained. The reality of the situation is that citizens are suffering the dehumanizing conditions at Mobile County Jail without having been adjudicated guilty of the acts for which they are imprisoned. This suffering is occasioned in the vast majority of cases simply because the detainee has insufficient financial resources to post bail and thereby obtain release. This situation is shocking to the conscience of the court.

■ The plaintiffs herein have moved for a finding of civil contempt for failure to comply with the injunctive order of this court pertaining to overcrowding. Failure to comply with an injunctive order issued by a court of competent jurisdiction is actionable as contempt of court. *Howat v. Kansas,* 258 U.S. 181, 189–190, 42 S.Ct. 277, 280–281, 66 L.Ed. 550 (1921) (citations omitted).

"Broadly speaking, a civil contempt is a failure of a litigant to do something ordered to be done by a court in a civil action. . . ." *Walling v. Crane,* 158 F.2d 80, 83 (5th Cir. 1946). Civil contempt, where appropriate, serves "to preserve and enforce the rights of private parties to suits, and compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the Court has found them to be entitled. . . ." *Palmigiano v. Garrahy,*

448 F.Supp. 659, 670 (D.R.I.1978), *citing In re Nevitt,* 117 F. 448, 458 (8th Cir.1902).

■ Plaintiffs seeking sanctions for civil contempt are held to proving noncompliance by "clear and convincing" evidence. *United States v. Rizzo,* 539 F.2d 458, 465 (5th Cir.1976). While the defendants herein are not held to "absolute compliance" with the court's order, *Palmigiano v. Garrahy,* 448 F.Supp. at 670, the court looks to see whether the defendants took "all the reasonable steps within their power to insure compliance with the orders", *id., quoting Sekaquaptewa v. MacDonald,* 544 F.2d 396, 406 (9th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977).

The court finds that the defendants are not in compliance with this court's injunctive order and that they have been out of compliance with said order since January 1, 1982. The defendants will in the immediate future be out of compliance.

The defendants have been dilatory in their efforts to reach a forthwith compliance. Efforts to achieve immediate compliance with the court's injunctive order have been rejected by the defendants. None of the reasons offered by the defendants relate to any inability to comply. The court is mindful of the efforts made by the defendants to procure appropriations for a new jail facility and sympathetic with the problems occasioned by the vicissitudes of state government. Because "willfulness" is not an element of civil contempt, however, the defendants intent is not in issue in this case. *Palmigiano v. Garrahy,* 446 F.Supp. at 670. Moreover, as noted previously, this court emphasized the importance of considering short-term solutions to bring the county into compliance with this court's injunctive order.

The defendants have been amply warned of the impending action of this court and have been given reasonable opportunity to come into compliance with the injunctive order. For more than nine months, and not until shortly before the hearing on these contempt proceedings, no significant reduction has been made in the prison population. Only within the last few weeks have the defendants taken any positive steps to reach immediate, short-term compliance.

The plaintiffs have met the requisite burden of proof. The defendants have not demonstrated sufficient efforts to comply. They have not even shown an inability to comply.

■ The defendant commissioners by their own testimony have the authority and the financial resources to allocate funds for a short-range solution. The defendant sheriff does not have this authority, however, it will be the defendant sheriff's obligation to operate and supervise any facility for the housing of inmates. Without the defendant sheriff's positive, steadfast and purposeful cooperation, the commissioners efforts could be thwarted, therefore, the defendant sheriff is found to be in contempt with the defendant commissioners. Accordingly, the court finds that the defendants are in violation of its injunctive order and are in civil contempt of court.

■ This court hereby imposes a daily fine of FIVE THOUSAND DOLLARS ($5,000) commencing October 29, 1982, and for each day that the defendants are out of compliance with this court's Injunctive Order of April 27, 1981 and the expired modifications pertaining to overcrowding. Defendants may purge themselves of civil contempt by achieving compliance with the population limitation heretofore set out in its order of April 27, 1981, of 125 non-state inmates in the present Mobile County Jail facility at any time before January 10, 1983. In the event the defendants do so comply, this court may quash this contempt citation and revoke the fine. *Powell v. Ward,* 487 F.Supp. 917, 935 (S.D.N.Y.1980); *Palmigiano v. Garrahy,* 448 F.Supp. at 672; *Hamilton v. Love,* 358 F.Supp. 338, 348, 361 F.Supp. 1235 (D.Ark.1973).

■ The plaintiffs asked this court to make such fines as this court may impose be designated for the sole benefit of the inmates of the Mobile County Jail. The court denies this request.

98

The aforementioned fine is necessary because the defendants have not demonstrated a willingness and a steadfastness of purpose to comply with the court's injunctive order. The order set specific dates for compliance. Rather than take deliberate measures to achieve compliance, the defendants have requested modifications and extensions of time and the court made some modifications and granted some extensions of time. The court is forced to conclude that ultimate compliance will not be made outside the context of coercive sanctions.

The purpose of this court's order is not punitive or remedial but is coercive. Given the character and magnitude of the harm caused by the defendants' noncompliance, and the financial resources of the defendants, the court has designed a sanction it feels not unduly burdensome but with all probable effectiveness. *See United States v. United Mine Workers,* 330 U.S. 258, 303–304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947).

This court has acted to hold these elected officials in contempt with great reluctance, and only after four hearings over a period of ten months. But for an unconscionable period of time the Mobile County Jail has confined inmates in excess of those set out in its orders. The court cannot be so derelict in its duties as to allow such to continue.

The court realizes that these sanctions, unless there is compliance by January 10, 1983, will ultimately burden the taxpayers of this community. There is already a heavy financial burden upon the citizens of Mobile County. Every hearing held in this matter is at the taxpayers expense for their own attorneys' fees as well as those of the Mobile County Jail Inmates. There is a further burden occasioned by a prison administration that maintains many prisoners in unnecessarily high security.

In addition to financial burdens, this court is compelled to recognize a subjective dehumanizing cost taxed against the citizens of Mobile County. The simple mandate of the Eighth Amendment of the Bill of Rights of the United States Constitution has been instrumental to the preservation of the dignity of human existence we as citizens of the United States have come to enjoy. The people of Mobile County have been laden with the unenviable opprobrium of a county jail that failed to meet minimum standards we as citizens of the United States have outlined for ourselves. Neither the Constitution nor this court requires the Mobile County Jail to have the comforts of a "country club" but none of us should want to violate human dignity and physical necessities nor retrogress to lower standards of the past centuries. This court must insist that the Mobile County Jail will come within the minimum constitutional limits. Towards that end, the court has an unescapable duty which it will not shirk and will take all appropriate and necessary measures.