MOBILE COUNTY JAIL INMATES,
et al., Plaintiffs,

v.

Thomas J. PURVIS, et al., Defendants.

Civ. A. No. 76–416–P.

United States District Court,
S.D. Alabama, S.D.

Jan. 17, 1984.

J.U. Blacksher, Blacksher, Meneffee & Stein, Mobile, Ala., for plaintiffs.

James C. Wood, Simon, Wood & Crane, Mobile, Ala., for defendants Mobile County Com'rs.

Roderick P. Stout, Stout, Roebuck & Halett, Mobile, Ala., for defendant Thomas J. Purvis.

ORDER

PITTMAN, Senior District Judge.

In a Memorandum Order dated December 30, 1983, this court ordered the defendant Mobile County Commissioners to pay into court a total of $175,000.00. The order generally outlined a plan under which this money would be used to alleviate the unconstitutional overcrowding at the Mobile County Jail.

A Supplemental Memorandum Order dated January 4, 1984 was entered setting up the two funds on the payment into court by the county commissioner defendants of the $175,000.00 pursuant to the December 30, 1983 order.

The December 30, 1983 order stated that "a more detailed order will follow within the next few days." This is that more detailed order.

I. *History of the Litigation*

Following protracted litigation concerning the conditions of the Mobile County Jail, this court on April 24, 1981 found that the totality of the circumstances and conditions of confinement at the Mobile County Jail violated the eighth and fourteenth amendments of the United States Constitution. The court found that overcrowding was the basic problem contributing to the deplorable and unacceptable conditions at the jail. In an Injunctive Order dated April 27, 1981, the court directed the defendants to make significant changes at the Mobile County Jail with respect to inmate population, supervision, health care, etc. The court ordered the defendants to reduce the inmate population, and set limits on the number of state and non-state inmates at the jail. The court set three deadlines to phase in the reduction of non-state inmates to certain limits:

| | |
|---|---|
| September 1, 1981 | 225 |
| January 1, 1982 | 175 |
| May 1, 1982 | 125 |

At the defendants' request, the court on January 22, 1982 froze the non-state inmate limit at 195 until May 1, 1982.

On April 30, 1982, the defendants again sought an extension of the 195 inmate limit. The court endorsed this motion "granted to July 22, 1982." The court held two hearings. The second hearing was held September 14, 1982. The non-state inmate population at the time of these hearings was 217 and 211 respectively—in excess of the court's modified order. Evidence showed that the average population from July 19, 1982 to September 6, 1982 was 206. At these hearings, the defendants advised the court of their intent to construct a large multi-million dollar jail complex. The evidence showed that the construction of this complex would take three to four years. The court stressed that the defendants should take steps to achieve immediate compliance while continuing their efforts for a long-term solution. In an order dated October 22, 1982, the court denied further extensions of the modified order and reinstated the Injunctive Order of April 27, 1981, which set a non-state inmate limit of 125.

On the motion of the plaintiffs, the court ordered the defendants to show cause why they should not be held in contempt of court for failure to comply with the April 27, 1981 Injunctive Order. After a hearing, the court on October 29, 1982 entered an order holding the defendants in contempt of court. 551 F.Supp. 92. The court noted that the defendants had been in violation of the court's orders, including the modifications, since January 1, 1982, and that there had been no significant reduction in the jail population in over nine months. The court found that the defendants had been dilatory and had not been steadfast in their attempts to comply with the court's orders.

The court imposed on the Mobile County Commissioners and the Sheriff of Mobile County a contempt fine of $5,000.00 per day from October 29, 1982 until they achieved compliance. The court provided, however, that the defendants could purge themselves of contempt by complying with the 125 non-state inmate limit before January 10, 1983.

In December, 1982, the defendants asked the court to extend the time in which they could purge themselves of the contempt citation from January 10, 1983 until August 15, 1983. They stated that the jail population was down to 166, and they expected that the population during such an extension would not exceed 150. They advised the court that they already had employed an architect to draw up plans and specifications for a new jail considerably smaller than their first plans and designed for pretrial detainees who constitute 85% to 90% of the jail population. They informed the court that planning work was under way. They said the additional time was needed to complete the plans, advertise the plans for bids, receive and tabulate the bids, and construct the facility. The court in an order dated December 17, 1982 extended to August 15, 1983 the time in which the defendants could purge themselves of contempt. The court was advised the site of the jail was not a problem. It developed otherwise.

On June 22, 1983, the defendants filed a second motion to extend the time to purge their contempt citation. At the hearing on this motion, the county attorney testified regarding the legal procedures necessary to obtain approval of a site for a new jail at Hartwell Field. The county simultaneously filed petitions with the Board of Adjustment of the City of Mobile and the Planning Commission of the City of Mobile. Both petitions were denied, and the county appealed both rulings. Appeal from the Planning Commission ruling was made to the Mobile City Commission which ruled in favor of the county. Appeal from the Board of Adjustment ruling was made to the Circuit Court of Mobile County. This appeal resulted in a jury trial and verdict in favor of the county. The opponents of the Hartwell Field site appealed to the Court of Appeals. They also filed a suit in this court alleging racial discrimination but dismissed that suit. This appeal was still pending at the time of the hearing on the defendants' motion for an extension.

In an order dated August 22, 1983, this court extended the time in which the defendants could purge themselves of contempt to December 31, 1983. The court reiterated that it would not tell them where to build a jail and had no desire to tell them how to solve the overcrowding problem, but it advised the defendants immediately to consider new and innovative solutions to prepare for the contingency of an adverse appellate court ruling.

Since that time, the appellate state courts have ruled against the defendants. As a result, the defendants are no closer to the completion of a new jail than they were in July, 1982, one and one-half years ago, when they sought extensions of time to build a jail. Neither have they significantly reduced the jail population or implemented any short-term solutions. The defendants asked the court to extend a third time the period in which they can purge the contempt citation. As a basis for this request, they noted the legal procedures necessary to gain approval of a site for a new jail. They again must submit the proposal to the Board of Adjustment and the Planning Commission. The decisions of these bodies may be appealed again. In spite of the defendants' attempts to shorten these procedures, a new jail could not be completed before June. There is great likelihood of delays that will make completion of a new facility much longer.

The defendants have been in violation of this court's orders, including the modifications and extensions requested by the defendants, since January 1, 1982, two years.

The court has repeatedly advised the defendants to seek immediate short-term solutions as well as long-term solutions. They have not done so.

The court has repeatedly granted time extensions to accommodate the defendants. The court held the defendants in contempt and imposed heavy fines. Yet there has been no significant reduction in the non-state inmate population in the past two years, and the time of completion of a new jail is uncertain. This court was compelled to take steps to relieve the unconstitutional overcrowding at the Mobile County Jail.

On December 30, 1983, the court ordered the defendant county commissioners to pay into court $150,000.00 in contempt fines and $25,000.00 in court costs. The court generally outlined a plan whereby the $150,000.00 would be used to reduce the jail population. The court provided that the $25,000.00 would be used to cover the compensation and expenses of a jail monitor to be appointed by the court. All of this money has been paid into the court. Pursuant to a Supplemental Memorandum Order dated January 4, 1984, the $150,000.00 has been paid into a fund designated as the "Prisoner Overcrowding Relief Fund" (POR Fund). This fund will be used to provide fees for bail bonds for certain low-bond pretrial detainees who are too poor to pay the fee themselves. The $25,000.00 was deposited in a court costs fund. It will be used to compensate a monitor who will administer the POR Fund and to cover his expenses.

In its December 30, 1983 order, the court also directed the plaintiffs and the defendants each to submit the names of three nominees for the position of jail monitor. All parties responded by submitting nominees as ordered. This order confirms the oral order on January 10, 1984 appointing Arthur J. Madden, III, one of the nominees submitted, to serve as jail monitor.

## II. *Authority to Implement Remedial Relief*

Throughout this litigation, this court has refrained from telling the defendants how to solve the overcrowding problem. The court has noted that it is "ill-equipped to involve itself intimately in the administration of the prison system." *Newman v. State of Alabama*, 683 F.2d 1312, 1320 (11th Cir.1982). The Eleventh Circuit has stated that a "district court in exercising its remedial powers may order a prison's population reduced in order to alleviate unconstitutional conditions, but the details of inmate population reduction should largely be left to prison administration." *Id.* at

1320–21 (quoting *Ruiz v. Estelle*, 650 F.2d 555, 570–71 (5th Cir.1981)). There are a number of ways in which the defendants could achieve compliance with this court's orders, and the choice of these solutions is best left to the county government. "Deference to prison authorities is especially appropriate when state penal authorities are involved." *Newman*, 686 F.2d at 1320.

Yet the court must find some way to achieve compliance with its orders. Although the court has given the defendants over two years in which to find and implement a solution, they remain far from compliance. Even a contempt citation over a year ago and the accumulation of $2,000,-000.00 in contempt fines have not obtained compliance.

Payment of the $2,000,000.00 into court would not immediately solve the problem.

Therefore, the court has taken a portion of the accumulated fines and ordered it used for the benefit of those whose constitutional rights are being violated by reducing the cause, overcrowding. The court is doing what it has repeatedly urged the defendants do, use an innovative method to solve the problem.

The evidence presented in this litigation shows that most of the non-state inmates are pretrial detainees and many of these are awaiting trial for non-violent, non-drug related offenses. On December 30, 1983, 155 of the 169 (91.7%) non-state inmates were pretrial detainees. Only 14 had been convicted for the crimes for which they were incarcerated. (It is noteworthy that the defendants generally get the jail population reduced just prior to hearings when they request extensions. Generally the jail population has been consistently over 200.) Statistics introduced at a hearing on September 14, 1982 showed that 84% were pretrial detainees and 43.570% of these pretrial detainees in the jail between July 19, 1982 and September 6, 1982 were awaiting trial for non-violent and non-drug related offenses. These pretrial detainees are in jail only because they are too poor to pay a fee for a bail bond.

Some courts faced with similar circumstances have ordered the release of pretrial detainees on their own recognizance. In *Duran v. Elrod*, 713 F.2d 292 (7th Cir. 1983), for example, the district court was faced with a year-old consent decree to reduce jail population and substantial noncompliance by the defendants. Many of the inmates in that case were low-bond pretrial detainees. The district court ordered the release of these low-bond detainees on their own recognizance as necessary to reach the population "cap." The Seventh Circuit affirmed their release.

A similar order was rendered recently in *Benjamin v. Malcolm*, No. 75 Civ. 3073 (MEL) (S.D.N.Y. Oct. 31, 1983). The court in this case was faced with the defendants' continued failure to comply with a consent decree concerning jail conditions and population. The court thus ordered the release of several groups of inmates including all pretrial detainees whose bond was less than $1,500.00 and who were not being held for certain types of crimes.

Rather than release these detainees on their own recognizance or order the $2,000,000.00 accumulated fines paid into court, this court has decided to use a portion of the accumulated contempt fines to pay bail bond fees for certain low-bond pretrial detainees not charged with violent or drug or controlled substance offenses. Since a large number of the Mobile County Jail inmates are awaiting trial for minor offenses, this plan could significantly reduce the overcrowding. The pretrial detainees are in jail only because they are too poor to make bail. By using the contempt fines to pay bail bond fees for these detainees with the lower bail, it is anticipated overcrowding can be substantially reduced with minimal intrusion into the administration of the jail by county and state authorities. This remedy should ease the fears of the community from individuals who are charged with violent or drug related offenses. The bail bond will provide some assurance that the released detainees will appear at trial.

Contempt fines have been used to implement the aims of injunctions. In *Cabrera v. Municipality of Bayamon*, 622 F.2d 4 (1st Cir.1980), contempt fines were accumulating as a result of the defendant's failure to comply with the district court's order to rehabilitate certain land. The First Circuit noted that "the district court may consider further exercise of its equitable power, perhaps to order the rehabilitation plan to be carried out by an independent contractor paid from the fund created by the contempt fines." *Id.* at 8. Likewise, in *Halderman v. Pennhurst State School and Hospital*, 526 F.Supp. 423 (E.D.Pa.1981), the court used the contempt fines to compensate Special Masters charged with according relief to the plaintiff class. The court stated "that funds created by court-imposed fines could properly be used *to redress the situation* originally complained of by plaintiffs." *Id.* at 427 (emphasis added) (citing *Cabrera*).

The court's authority to appoint a jail monitor to oversee the implementation of its remedial orders is well documented. Numerous federal courts have appointed special monitors in jail conditions cases to assist in achieving compliance with the courts' orders, and the courts of appeals have approved this practice. *See, e.g., Newman v. Alabama*, 559 F.2d 283 (5th Cir.1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Thomas v. Gloor*, CA No. 77–P–0066–S (N.D.Ala. Nov. 19, 1981); *Guthrie v. Caldwell*, CA No. 3068 (S.D.Ga. June 20, 1979); *Jones v. Wittenberg*, 73 F.R.D. 82 (N.D.Ohio 1976); Note, *Mastering Intervention in Prisons*, 99 Yale L.J. 1062 (1979).

III. *Instructions to the Jail Monitor and Solicitation of the Defendants' Cooperation*

The monitor will be under the supervision of Magistrate David A. Bagwell who will, at such times as he sees fit, issue more detailed guidelines. As the development of the plan goes forward it is likely these instructions will be modified and changed from time to time.

I want to stress some of the remarks I made to you on Friday, December 30, 1983, when I announced the plan we are beginning to operate under. These remarks had been published by the 1983 American Assembly, Columbia University, concerning innovation.

One is that the climate in which the innovation occurs is a dominant factor in its success.

Another is that an essential ingredient for the innovative process is the disposition and attitude of those involved.

Another is that general information and education are needed to enable the public *to think sensibly* about innovative matters.

Especially important were their remarks that *managers are the key ingredient* and *conciliatory* rather than adversarial *interactions are needed.*

I say to the monitor that his management of this plan will be the most important single factor in accomplishing the goal of bringing the county jail population down to 125. I say to the monitor, to the defendants, and Mr. Al Pennington, previously appointed by the state court to facilitate a reduction in overcrowding, that there is an urgent need for conciliatory rather than adversarial interactions between you.

From the $25,000.00 court costs fund, the monitor is to be paid $75.00 per hour, the fee suggested by the defendants. He is to keep a daily log of the time devoted to serving as the monitor. He is to submit a log with an affidavit of its correctness every two weeks. After approval by the magistrate and the court, the court will issue an order to the Clerk of the Court to pay for his services for the past two weeks and to reimburse him for any expenses incurred. Receipts are to be submitted with an affidavit for expenses. If the monitor prefers bills be rendered to the court, he may do so together with an affidavit that the bills represent proper and necessary expenses and the court will order the Clerk to pay the vouchers.

From the $150,000.00 deposited in the "Prisoner Overcrowding Relief Fund"

(POR Fund), payment will be made for bail bond fees. For each bail bond fee paid, the monitor is to obtain a voucher from the bondsman recipient and is to submit an affidavit that the fee has been paid pursuant to the orders of this court setting up this plan. The jail monitor is to sign the checks. They will be countersigned by Magistrate Bagwell.

The magistrate has been instructed to investigate the usual and customary fees paid for surety bonds. A surety bond for an appropriate amount of money will be paid out of the $25,000.00 court costs fund to bond the monitor.

The magistrate is to investigate and determine an appropriate auditor to audit periodically expenditures from the POR Fund at appropriate times. This will be paid out of the court costs fund.

The monitor is instructed to work closely with all of the defendants and Mr. Pennington in determining the persons eligible for relief under this program. Each person's name authorized for release under this plan is to be agreed upon by the monitor and Mr. Pennington. In the event they have a divided opinion, the magistrate is authorized to make the decision.

The jail monitor and the defendants must take a positive "can do" attitude to make this plan work and work promptly to reduce the jail population to the figure ordered. I can see no reason why all of you should not work in harmony and in cooperation.

From the testimony offered at the hearing on December 30, it appears that several weeks or longer may elapse between the time a person is picked up on a charge, the amount of the bail fixed, and if he is unable to make bail, goes to trial. The monitor is directed to start with those who have been in jail the longest and work back to those more recently incarcerated. In the beginning he is to consider only those whose bail bond is fixed at $2,500.00 or less and who are not in jail on a charge involving murder or some other type of homicide, rape, some other form of aggravated violence, breaking and entering homes or trafficking in drugs or related controlled substances. The idea is that persons charged with crimes involving aggravated physical violence or trafficking in drugs or related offenses should not be eligible under this plan.

The monitor is to ascertain the usual and customary fee charged by companies, businesses or individuals who make bail bonds for a fee. It is the court's understanding that 10% or 15% of the total bond has been the usual fee; however, the monitor is to ascertain the usual and customary fee and that is the fee to be paid. The obligation of the bondsman is that required by the state court. It usually requires the bondsman to pay whatever amount of a forfeited bond is ordered when the person charged fails to appear for trial. His liability would be of assistance in securing the attendance of the person for trial bonded by him. It is not anticipated that full cash bonds will be posted from this fund.

Any plan is subject to abuse. There are two or three things I desire to call to everyone's attention, including the inmates and those who may be charged in the future and placed in jail. This payment is not designed nor intended to provide bail for any person immediately upon his being placed in jail nor who can pay his bail fee. It is for those who are too poor to pay the bondsman's fee. A person should remain in jail sufficiently long enough to satisfy the monitor that an affidavit made by that person that he is too poor to secure a bail bond is worthy of belief. This should be a period of several days. All persons approved for release under this plan should make an affidavit sufficient to satisfy the monitor that he is too poor to secure bail.

If it becomes necessary for the monitor to select a bondsman, he is instructed not to give preferential treatment to any business or individual in the assigning or designation for receipt of the bail bond fees. He should be satisfied that the fee is that which is usual and customary according to past and current practices. Gouging should not be permitted.

The monitor is instructed that he is not in any way to participate in or interfere with the state court practices and procedures. The state court according to its practices and procedures is to fix the amount of the bail bond, approve the bondsman, and take what steps are necessary in its discretion to hold the bondsman responsible to the obligation imposed upon him by the state court.

It is completely within the discretion of the state court whether or not to release a person on his own recognizance. The monitor is not to recommend nor participate in any of the above decisions. In short, there is to be no interference with the state court practices and procedures.

It seems that the above instructions are those that prudent and efficient management of this program require and are not intended to suggest that any inmate, person or business intends to abuse the system.

The bottom line is—make the program work promptly, efficiently and honestly.

### IV. *Conclusion*

In fashioning this remedy, the court has sought to relieve the unconstitutional overcrowding with the least possible intrusion into the jail's administration by the county and state authorities. The court has sought to allay community fears. The court has sought to retain some assurance that the released detainees will appear for trial by providing for bondsmen.

This plan is only a short-term solution. It is imperative that the defendants provide a long-term solution as soon as possible. They should also continue to search for any short-term solutions that may aid in reducing the jail population. The $5,000.00 a day contempt fines will continue to accrue until the defendants reduce the jail population to 125 as ordered April 27, 1981. The court has not remitted any of the accumulated fines. The court's order which granted the defendants' request to stay collection of the contempt fines, subject to the termination of the stay at this court's discretion of December 30, 1983 is set aside. In lieu thereof the defendants' request that the time in which they can purge a part of or all of the remainder of the contempt citation be extended to August 1, 1984, is GRANTED.

It is therefore ORDERED:

1. That Arthur J. Madden, III is hereby appointed jail monitor to carry out the duties of the jail monitor pursuant to this court's orders and instructions, which may be altered, modified, or supplemented by the court or Magistrate David A. Bagwell subject to approval by the court.

2. That the defendants assist monitor Madden and promptly provide to him all information necessary to execute these duties.

3. The defendants are granted a stay to August 1, 1984 to purge themselves of a part or all, at the discretion of the court, of the remainder of the contempt fine by achieving compliance with the 125 non-state inmate limit at the present Mobile County Jail facility before August 1, 1984.