Linda **LAUBE, et al., Plaintiffs,**

v.

Michael **HALEY, et al., Defendants.**

No. CIV.A.02–T–957–N.

United States District Court, M.D. Alabama, Northern Division.

Dec. 2, 2002.

Stephen B. Bright, Tamara H. Serwer, Marion D. Chartoff, Lisa Kung, Southern Center for Human Rights, Atlanta, GA, John A. Russell, III, Aliceville, AL, for Plaintiffs.

Ellen Ruth Leonard, Office of the Attorney General, Montgomery, AL, William F. Addison, Andrew W. Redd, Alabama Department of Corrections, Montgomery, AL, for Defendants.

## OPINION

MYRON H. THOMPSON, District Judge.

The complaint in this lawsuit charges that conditions for female inmates in the Alabama State Prison System violate the Eighth Amendment to the United States Constitution. The plaintiffs are 15 female prisoners incarcerated in the following three facilities: the Julia Tutwiler Prison for Women (Tutwiler), located in Wetumpka, Alabama; the Edwina Mitchell Work Release Center (Mitchell), also located in Wetumpka, only a few hundred feet away from Tutwiler; and the Birmingham Work Release Center (Birmingham), located in Birmingham, Alabama. The defendants are Governor Don Siegelman, Department of Corrections Commissioner Michael Haley, Tutwiler Warden Gladys Deese, Mitchell Acting Warden Patricia Hood, and Birmingham Director Mary Carter. The plaintiffs have brought suit on behalf of themselves and all other female state prisoners in Alabama.

The plaintiffs make various claims that the defendants operate the three facilities in an unsafe manner and do not provide the facilities' inmates with their basic human needs, all in violation of the Eighth Amendment, made applicable to the States by the Fourteenth Amendment and enforced through 42 U.S.C.A. § 1983. In support of their claims, the plaintiffs assert that the following conditions exist at Tutwiler: overcrowding, inadequate supervision in open dorms, improper or inadequate inmate classification, inmate violence, the availability of weapons, the small number of segregation cells, inadequate living space, inadequate ventilation and extreme heat during the summer. They assert that the following conditions exist at Mitchell: overcrowding, inadequate supervision in open dorms, inadequate living space, and inadequate ventilation. And

they assert that the following conditions exist at Birmingham: inadequate supervision of the segregation unit and overall inadequate ventilation in the facility. The plaintiffs allege that the defendants have been deliberately indifferent to these conditions and the serious risk these conditions pose to inmates. Jurisdiction is proper pursuant to 28 U.S.C.A. § 1331 (federal question) and 28 U.S.C.A. § 1343 (civil rights).

Now before the court is the plaintiffs' motion for a preliminary injunction. Based on the evidence presented at a hearing held on September 23 through 27 and on October 10, 2002 (as well as an earlier on-site court visit to both Tutwiler and Mitchell) and other submissions, the court concludes that the motion should be granted to the extent that some of the conditions at Tutwiler (most particularly, significant understaffing of security officers in greatly overcrowded inmate dorms) have resulted in an impermissibly unsafe environment for inmates. The motion will be denied as to Mitchell and Birmingham, and as to Tutwiler in all other respects.

## I. STANDARD FOR PRELIMINARY INJUNCTION

Whether to issue a preliminary injunction lies within the sound discretion of the district court. *Frio Ice, S.A. v. Sunfruit, Inc.*, 918 F.2d 154, 159 (11th Cir.1990). The Eleventh Circuit Court of Appeals has established a four-prong test for the district court to apply when determining whether a preliminary injunction should issue. Under this test, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) the threatened harm to the plaintiff outweighs any harm that the injunction may cause the defendant; and (4) the public interest will not be disserved

by the grant of a preliminary injunction. *Id.* After first making preliminary findings of fact, the court will explain why, based on the application of the above four-prong test, preliminary relief is warranted on some of the plaintiffs' claims.

## II. PRELIMINARY FINDINGS OF FACT

### A. Tutwiler

#### 1. *General Description of the Facility*

Tutwiler began housing inmates in 1942 and was originally designed to hold 364 inmates. Tutwiler now houses approximately 1,017 inmates of all security levels. Over the years, modifications have been made to the facility's infrastructure—sewage system, kitchen, and laundry—to expand its capacity. Even with design modifications, however, the facility was never meant to house as many as 1,017 inmates. The inmates are housed in ten dorms, two "Medical Isolation Units" (MIUs), several segregation units and two death row units. Each of the ten dorms is designated to hold a specific type of inmate population. The housing designations are as follows:

| HOUSING UNIT | TYPE OF INMATE POPULATION | NUMBER OF INMATES[1] |
|---|---|---|
| Dorm One | General population | 82 |
| Dorm Two | Faith dorm—for inmates with good behavior who want to participate in religious programs available in the dorm | 80 |
| Dorm Three | Honor dorm—for inmates with good behavior | 80 |
| Dorm Four | General population | 82 |
| Dorm Five | Drug treatment | 60 |
| Dorm Six | Mental health | 76 |
| Dorm Seven | Aged, infirm, and pregnant | 82 |
| Dorm Eight | Intake and receiving—where inmates are placed upon arrival | 63 |
| Dorm Nine | General population | 238 |
| Dorm Ten | Drug treatment | 106 |
| MIU 1 | HIV-positive | 20 |
| MIU 2 | HIV-positive | 20 |
| Segregation | Inmates with disciplinary infractions, maximum- and closed-security inmates,[2] inmates sentenced to life without parole, and inmates in protective custody | 21 |
| Death Row | Inmates sentenced to death | 4 |

Tutwiler has a total security staff of 92 officers; when the facility is fully staffed, 23 of these officers are on duty at any one time.

#### 2. *Conditions at the Facility*

The plaintiffs contend that a multitude of conditions and factors at Tutwiler, alone or in combination, are uncon-

---

**1.** Figures for the number of inmates housed in each unit are approximations and are based on representations the defendants made on a map of Tutwiler. The defendants did not note the capacity of the MIUs on this map, but stated in testimony that each MIU held around 20 inmates. The defendants have labeled dorm nine as holding 228 inmates; Warden Deese has stated at other times that dorm nine holds 238 inmates.

**2.** "Closed" security is a higher security classification than "maximum." Inmates classified as "closed" are considered violent and must be kept separate from other inmates.

stitutional. These conditions and factors include overcrowding, open dorms, inadequate supervision, the classification system, the presence of make-shift weapons and contraband, inmate violence, the small number of segregation cells, poor ventilation, and heat. The court will discuss each of these in turn.

a. *Overcrowding:* All parties acknowledge that Tutwiler, now housing approximately 1,017 inmates, is far beyond its original design capacity of 364 inmates. Over the years, the facility's infrastructure has been modified and additional beds and dorms have been added as the inmate population has grown. In the last few years, beds have been placed in every available space in every dorm; the only reason that more beds have not been added to the dorm facilities is that, simply put, not one more bed will fit. The facility, according to Warden Deese, is at its absolute capacity. Commissioner Haley stated this meant two things: (1) the facility cannot accommodate more beds in its existing dorms; and (2) although there is other space in the facility where beds could conceivably be placed (the visiting area, classrooms, and treatment areas), doing so would cause significant problems for both management and the inmate population. For example, Warden Deese testified that adding more beds would mean converting the visitation area to a dormitory and eliminating some programs and all visitation to inmates, which could result in considerable disruption in the inmate population. Further, Commissioner Haley testified that adding more beds would seriously tax the facility's infrastructure. He emphasized that the prison currently uses Wetumpka's sewage system and cannot contribute any more waste to the system; that its kitchen and laundry are not capable of additional service and that it has used all available land. In short, Haley and Deese stated that Tutwiler's population has reached its absolute limit, it has maximized its infrastructure, and its population cannot be safely increased.

Some examples illustrate Tutwiler's overcrowding more clearly. Each dorm has a similar layout: bunk beds are laid in rows and arranged head to toe, within inches of one another. In some dorms, inmates can lie on their beds, reach out their arms, and touch other inmates. In dorm ten, some inmates have difficulty climbing to their top bunks because the proximity of other beds limits access to the ladders at the heads of their beds; inmates who sleep in top bunks often wedge their way between the bunks and then work their way to the top bunk. The health-care unit is so short on space that three beds have been placed in the hall to house inmates who are waiting for or returning from operations; these inmates share the hallway with everyone entering and leaving the health care unit.

Living space at Tutwiler is further restricted by the fact that many inmates spend the majority of their time confined to the small area of their bunks, sitting on their beds. Some inmates spend upwards of 80% of their time on their bunks in order to stay out of trouble and for fear of becoming engaged in an altercation.

While Tutwiler's infrastructure has been modified in the past to handle more inmates, it is now so overcrowded that each inmate's living space is severely limited, and adding even one more bed would create an unacceptable burden.

b. *Open Dorms:* Unlike some prisons, in which one, two, or three inmates are housed in one cell, Tutwiler employs the dorm system of housing in which 60 to 228 inmates are housed in a single, cavernous room. This type of housing, while accept-

able, still raises significant safety issues that must be addressed.

To begin, the dorm system creates visibility problems for officers. It is difficult for officers to observe activity in the dorms because the rows of bunk beds, stacked from the front of the dorms to the back, block sight lines within the dorms. The bunk beds also make it difficult for an officer standing or walking at floor level to observe activity taking place on both the bottom and top bunks. While bunk beds might not pose a problem to visibility in smaller cells, the rows of bunk beds within the dorms prevent officers from clearly observing inmate activity.

More importantly, the sheer number of inmates housed in open dorms pose a significant security problem. Idleness is less of a safety concern when each inmate is confined to her own cell or shares a cell with just a few other inmates. In dormitories, however, idleness heightens the potential for disruptive behavior because each potentially aggressive idle inmate now has other inmates whom she may target, as well as other potentially aggressive inmates with whom she may congregate. Dorms at Tutwiler hold 60 to 228 inmates, and some of these inmates sit idly during the day. While the evidence submitted does not reveal the extent to which inmates are idle at Tutwiler, even limited periods of idleness can engender safety problems. Open dorms are particularly dangerous when a facility is also plagued by, among other things, inadequate supervision, increased violence, and inmate access to weapons, as discussed below.

c. *Supervision:* In an overcrowded open dorm, where weapons are readily available and inmates are mis-classified, as discussed below, adequate staffing is an absolutely necessity; the evidence shows, however, that Tutwiler is severely understaffed. In 1979, Tutwiler housed 169 inmates and had a total security staff of 87; the facility now houses approximately 1,017 inmates with a total security staff of 92. Thus, the addition of 884 inmates, or a six-fold inmate increase, has been accompanied by the addition of only five officers. Warden Deese has requested 58 additional correctional officers to staff the facility, a number that she stated is not "fluffed up," but necessary to satisfy the facility's basic security needs. In the meantime, officers working overtime help to compensate for the shortage of correctional officers.

In her deposition, Warden Deese stated that there were currently 23 security posts at Tutwiler prison; she said that, of these 23 posts, 20 were "priority" posts that should be staffed at all times in order to ensure inmate safety. When she testified at the preliminary-injunction hearing on this matter, however, Warden Deese changed her calculation and classified only 16 posts as "priority." The shift logs for July 2002 show that, by either standard, Tutwiler is severely understaffed.

The July 2002 shift logs for the second shift reveal acute understaffing at Tutwiler. Second shift runs from 6:00 a.m. to 2:00 p.m. and is the most active shift, requiring the most security. In July, an average of 12 officers were on duty for the second shift; this is four fewer than the minimum necessary to run the prison safely. At most, there were 16 officers on duty, seven fewer than the 23 that should actually be present at the facility, and this occurred on only two occasions. On one day, second shift was staffed by just nine correctional officers, almost half the minimum number necessary to ensure inmate safety.

Furthermore, a large percentage of officers working second shift were working overtime. An average of 37% of each day's second shift staff was made up of officers working overtime and, at times, 100% of the officers on duty were working

overtime. The July figures reveal that overtime plays a large, but incomplete, part in compensating for Tutwiler's unmet security needs.

Because Tutwiler is understaffed, dorms are regularly left unattended. For instance, dorms one through four are normally guarded by only two officers. One officer is to rove between dorms two and three (80 inmates each for a total of 160 inmates), while another officer is to rove between dorms one and four (82 inmates each for a total of 164 inmates). While an officer roves one of the two dorms assigned to her, the other dorm is left unsupervised. Therefore, at any one time, when the prison is fully staffed, at least two dorms are left unattended. When the prison is not fully staffed, one officer is often assigned to guard all four dorms; in short, one officer must ensure the safety of 324 inmates located in four different dorms, all of which have obstructed sight lines. Clearly, this limits the amount of attention and oversight one officer can give to any one dorm or inmate.

Understaffing poses a special danger in the intake dorm, dorm eight, because it has both a unique physical structure and an unclassified inmate population. Dorms one through four and dorms six and seven each have a large open wall, facing the main hallway, closed off by metal bars. Officers in the hallway can see inside each of these dorms (albeit only to the extent that sight lines are not obstructed by bunk beds) without opening a door. Instead of an open grating, dorm eight has four solid walls and a metal door leading to the main hallway. While dorm eight is officially a security post, at which an officer should be stationed, it regularly has no officer assigned to guard it. In fact, it is the norm for one officer to cover both dorms six and eight. If the officer is in dorm six and something happens in dorm eight, inmates in dorm eight cannot run to a grate facing the hallway to get help, as inmates in other dorms can do. Instead, inmates in dorm eight must pound on and shake the door, shouting for an officer to come assist them; dorm eight has no alarm and no easy way to get an officer's attention. Even worse, about once a week, one officer is assigned to guard dorms six, seven, and eight at once, a total of 221 prisoners. Not only does this pose a danger to inmates in dorms six and seven, but it is especially dangerous for inmates in dorm eight who are less capable of attracting officer attention and who are an unclassified population in which mentally ill, passive, and aggressive inmates are mixed together.

Dorm nine, known as "the zoo," poses perhaps the biggest danger to inmates; it houses 228 inmates in one room. One inmate described living in dorm nine as the "scariest experience of her life." Warden Deese stated in her affidavit that, as of July 11, dorm nine was staffed by only one officer 80% of the time, even though three officers are needed to properly oversee dorm nine due to the large number of inmates and the poor visibility within it. Because of its substantial size and large population, it can take an officer a full hour to rove the entire dormitory. Moreover, this officer's attention may be difficult to attract: one inmate testified that she had to crawl on the top bunk to locate an officer when a fight occurred.

Problems from understaffing also plague dorm ten; it has an L-shaped design, making it impossible for an officer to observe inmates located around the corner. It was in this dorm that an officer, guarding 106 inmates on her own, was attacked by a mentally ill inmate. While the officer was being beaten, inmates tried to radio other officers for help, but the officer's radio was not functioning. By happenstance, the door to dorm ten was open for dinner, and inmates were able to run into the main prison building and secure help for this officer. Otherwise, this officer, without

back-up or radio communication, would have remained unaided.

d. *Classification:* Upon arrival, an inmate is housed in dorm eight until she is classified by a specialist and placed in an appropriate dorm or work-release center. An inmate is classified according to her criminal, medical, and behavioral history. Classification is an important part of ensuring inmate safety, because it involves separating aggressive inmates from passive ones and mentally ill inmates from the general population. Not only is it important to classify inmates correctly at intake, it is also necessary to constantly update and keep each inmate's status current. This minimizes the danger posed by violent inmates to non-violent inmates.

Work-release eligible inmates are sent to Mitchell or Birmingham; those remaining at Tutwiler may be classified into a drug-treatment dorm, the mental-health dorm, the honor dorm, the faith dorm, the dorm for the aged, infirm, and pregnant, or a general-population dorm. Inmates placed in the general-population dorms are not further separated based on their potential for violence, history of committing violent crime or their lack thereof. Maximum- and closed-security inmates are placed in single cells in segregation.

Some inmates at Tutwiler are "overclassified," meaning they are eligible for work release or do not pose a threat to other inmates, yet are housed with inmates who might pose such a threat. Overclassification is a safety risk to overclassified inmates because they are housed with inmates who are more dangerous than themselves; overclassification has the further ramification of taking up much needed bed space in higher security dorms. Updating inmates' classifications periodically would improve both safety and overcrowding.

The proper classification of mentally ill inmates is especially important. Mentally ill inmates at Tutwiler are classified according to the severity and history of their illness. However, if at the time of classification, a mentally ill inmate is not deemed to pose a threat to others or is not experiencing mental-health problems, she is placed in the general population regardless of the severity of her illness. This system leads to various problems because, although not exhibiting symptoms, some of the mentally ill inmates who have been classified as fit for the general population remain a threat to other inmates; conversely, some mentally ill inmates are vulnerable to control and attack at the hands of aggressive inmates.

For example, one inmate, T.R., who suffers from bipolar disorder, was unable to take her prescribed medication while in receiving. Consequently, her behavior became erratic and she was involved in a fight. T.R. was moved to Mitchell, despite the fact that she had already engaged in violent behavior. T.R. was later involved in two more fights, yet she was never properly medicated, placed in the mental-health dorm, nor classified as dangerous to others.

Perhaps most serious of all is an incident which occurred in the summer of 2002, involving T.B., a mentally ill inmate who was released from mental-health segregation. T.B. was classified into dorm six, the mental-health dorm, but dorm six had no available beds and T.B. was instead placed in dorm ten, a drug-treatment dorm, with further arrangements to be made later. Before those arrangements could be made, however, T.B. attacked and severely injured the lone officer guarding the 106 inmates in dorm ten.

These incidents demonstrate that, regardless of the current classification system and the medical needs of mentally ill

inmates, they are often placed in the general population although they are unfit for such placement and can cause considerable harm.

e. *Contraband and Potential Weapons:* At Tutwiler, many unsecured, potentially dangerous objects are readily available to inmates, without restriction, and are used as weapons. In the dorms, handles from openly available brooms and mops can be removed and used as weapons; combination locks, given to inmates to secure their property, can be placed in socks and used as weapons; and inmates are allowed to own safety razors which can be stepped on and crushed, yielding two thin razors that may be used as weapons. In May and June alone, two inmates were cut with disassembled razors. Another inmate was threatened with broken mop and broom handles and locks placed into socks.

There is some additional, though limited, danger from contraband. Prison officials have testified that most contraband seized by officers is not dangerous in nature, mainly consisting of extra clothing or make-up. In July, the only potential weapons found during daily, random "shakedowns"—searches of individual inmates or entire dorms for contraband— were two pairs of plastic safety scissors, the type commonly used by elementary school students. On July 10, 2002, the Corrections Emergency Response Team came to Tutwiler for a complete shakedown of dorm nine. The team found one disassembled razor (outside dorm nine), one six-inch piece of flat metal, two pieces of broken plexiglass, and six six-inch pieces of wire hidden in the dorm's ceiling panels. From the testimony given regarding shakedowns and potential weapons, it appears that the real danger lies not in contraband kept against prison rules, but rather in everyday objects that can be easily used as weapons against other inmates.

f. *Violence:* The large number of inmates in Tutwiler has increased the risks to inmate safety. Overcrowding has increased the risks to inmate safety in three ways: (1) inmates cannot retreat from conflicts; (2) inmates fight to access limited resources; and (3) fights and tension have increased.

Inmates have no personal space and no time away from other inmates. Moreover, if involved in a dispute with another inmate, an inmate has no place to which she may retreat. This lack of personal space at Tutwiler, in combination with other factors such as improper medication or classification, has had a direct role in inmate attacks on other inmates.

Inmates' lack of access to limited resources has also caused conflicts at Tutwiler. For example, during the summer, all inmates want relief from the unrelenting heat, putting fans and ice at a premium. Although fans are to be rotated every four hours according to a schedule, aggressive inmates sometimes refuse to turn the fan according to schedule, leading to fights and violence. Officers are technically in charge of fan rotation, but fights still occur as officers are not always available to supervise and monitor the fans. Similarly, the desire for ice can also lead to fights. "Ice call" is twice a day, and some inmates push their way to the front of the line.[3] Most inmates choose to leave these aggressive inmates alone, letting them move to the head of the line; those who do not

---

**3.** Tutwiler has seven ice machines. During the summer, ice from these machines is distributed to inmates at "ice call." Dorm ten has its own ice machine and, therefore, does not have an "ice call."

acquiesce, however, face physical retaliation and violence for their refusal.

Aside from the lack of space and limited resources, overcrowding has led to a general increase in fights. For a 90–day period in the spring and summer of 2002, there were five assaults on personnel, seven assaults on inmates, and 17 fights between inmates; in dorm nine alone, two inmates were assaulted and cut with razors. In fact, in May 2002, Tutwiler had the highest inmate assault rate of all institutions in Alabama, including male facilities. Fights are prevalent within Tutwiler, and for the most part go unreported. For this reason, the court believes that the situation is worse than the cited figures indicate, as these figures only represent reported fights.

Incidents involving physical violence are often quite serious. For example, two inmates were attacked in their sleep. One inmate's neck was cut from her ear to her chin by a mentally ill inmate wielding a disassembled razor. On May 14, 2002, another inmate was cut with a razor. Finally, as discussed above, an officer was severely beaten by an inmate in July 2002. At the time of the preliminary injunction hearing, the officer had yet to return to work.

g. *Segregation Cells:* Segregation cells are important in securing inmate safety and are necessary to maintain order; the prison must have a place to secure inmates who have violated a disciplinary rule. The use of segregation cells demonstrates to inmates that violations will be punished, and it isolates dangerous inmates from the general population. Having adequate separation space is an important management tool for a correctional facility.

Tutwiler, however, has inadequate segregation space. Under the American Correctional Association (ACA) guidelines, a prison should have enough segregation cells available to house 10% of its population. Currently, Tutwiler has only 21 segregation cells, enough to house roughly 2% of its population; under ACA guidelines, Tutwiler should have 101 segregation cells.

The 21 available cells are used to house inmates for administrative and punitive reasons, inmates in protective custody, inmates who have been sentenced to life without parole, and inmates who have been classified as maximum or closed security. There are currently 12 to 13 inmates sentenced to life without parole, leaving approximately eight cells for all other uses.

The dearth of segregation cells has caused prison officials to establish a waiting list for segregation cells. As of July 11, 2002, 39 inmates had violated the rules and were waiting to serve time in segregation. The lack of segregation space has also led officials to release inmates early when a cell is needed to place a violent inmate in segregation immediately. These two facts—the prison's inability to place inmates in segregation immediately upon a rule violation and the inability to keep them in segregation for their full punishment—seriously compromise discipline and inmate safety at Tutwiler.

h. *Ventilation and Heat:* Tutwiler is extremely hot in the summer and lacks needed ventilation, creating a stuffy, stagnant climate. For the most part Tutwiler has no air handlers to provide for the exchange of stale air and fresh air; only dorm ten has exhaust fans which circulate stagnant air out of the dorm and new air into the dorm. Warden Deese has attempted to cope with this situation by opening dorm windows, placing large floor fans in the dorm aisles, and affixing fans to the walls. The little effect, if any, of the floor and wall fans is to move hot air around. Moreover, the small relief provided by these fans is limited by the fact that there are so few of them. Therefore, fans are rotated every four hours to ensure that

each area has a fan for some time during the day. As noted above, aggressive inmates sometimes prevent other inmates from moving the fans according to schedule, resulting in fights or simple acquiescence by those inmates who do not wish to fight.

Other measures provide little relief from the heat. Each dorm has ice call twice a day, once in the morning and once around 8:30 in the evening. Ice is sometimes not available at mid-day, however, when the heat is at its height. Facility protocol requires increased ice calls, additional opportunities to shower, and increased access to drinking water when the temperature rises above 90°. Tutwiler, however, is not equipped with any instruments to monitor the heat. As a result, there is no way for officials to determine when the temperature is above 90° and protocol should be followed.

The lack of ventilation manifests itself differently throughout Tutwiler. Inmates in dorm eight, because they have little opportunity to leave the dorm, suffer more from poor ventilation than their counterparts in the general population. Dorm eight inmates are in "intake," they are not allowed access to the general exercise yard; instead, they must use a separate, smaller yard twice a day.[4] Because opportunities to go outside are limited, smoking (though prohibited) is common in the dorm. Therefore, dorm eight inmates spend most of the day inside a hot, smoky room. Dorm nine houses 228 people and is called the "hot zone." It is "terribly hot" because floor and wall fans do a poor job

of circulating air within the dorm. The same is true for the climate in segregation, which is "like a desert." Inmates in disciplinary segregation may shower only every other day and must wear thick jumpsuits all day.[5] Five fans are available for the 17 cells in segregation and hence, air does not circulate to every inmate. These inmates are left to hope for rain, which provides some air through the windows of their cells. Other parts of the facility are alleged to have poor ventilation as well, but there is no specific evidence before the court regarding these other areas.

### B. Mitchell and Birmingham

#### 1. *General Description of the Facilities*

If an inmate is classified as eligible for work release, she will be sent to either Mitchell or Birmingham. These facilities are smaller and less crowded, and have lower security. At the time of the hearing, Mitchell housed 242 inmates in two dorms and had a capacity to house 260 inmates; Birmingham housed 285 inmates in 14 dorms and had a capacity of 312 inmates. At the time of the preliminary injunction hearing Mitchell and Birmingham were not at full capacity.

#### 2. *Conditions at the Facilities*

a. *Open Dorms:* Mitchell's dormitories are configured much the same as those in Tutwiler. Mitchell has two dorms of 121 inmates each. The inmates range in classifications from "community custody" (these inmates may go into the outside community, earn salaries, and have the privilege of wearing street clothing) to

---

**4.** This yard is quite small and is not been able to accommodate all 63 residents of dorm eight at one time. It is unclear whether all inmates are actually able to access the yard twice a day.

**5.** Disciplinary segregation is different from other types of segregation. Inmates may be housed in segregation for a variety of reasons;

for example, they are in protective custody, are on death row, or their security classification calls for constant segregation. Inmates in disciplinary segregation are housed in segregation for disciplinary infractions, and, it appears from the hearing testimony, are subject to harsher conditions than are other inmates in segregation.

"minimum out" (these inmates may go into the outside community and work, but may not earn salaries and are still required to wear "whites," the prison uniform).[6] Each of Mitchell's two dorms is equipped with an elevated-officer post, from which officers have unobstructed views of the top bunks, but cannot see all of the lower bunks. Two officers are assigned to supervise each dorm. Warden Hood has requested more officers to staff her facility. At this time, the court has not heard any evidence of serious safety problems at Mitchell.

Inmates in Birmingham are housed in 14 dorms which hold between 22 and 26 inmates each. These inmates are classified as "community custody." As a result, these inmates require little security, and the whole facility is supervised by only two officers. There are no allegations that these conditions are overcrowded or unsafe.

b. *Birmingham's Segregation Cell:* Birmingham's segregation cell, the "holding cell," is located on the second floor and can hold up to four inmates who may remain there anywhere from 24 hours to a week. The holding cell was not initially designed to be used as a segregation unit; it is a storage room that has been converted to hold inmates. Two kinds of danger are posed to inmates secured within the holding cell.

First, the cell is very hot. It has no window and, although the holding cell has a vent, there is no moving air in the cell and only a fan outside the cell. The cell can get so hot that, on occasion, inmates have removed their shirts in order to gain some relief from the heat. Inmates in the holding cell are given one pitcher of ice every eight hours to cool themselves.

The second danger posed to inmates secured in the holding cell is a lack of supervision. Two officers are assigned to guard the entire facility each shift. One of these officers is assigned to "rove" Birmingham. The rover's duties include checking on the inmates in the holding cell every half hour, checking all areas of the facility, both inside and out, giving inmates their medication, and assigning details. If any inmate in the entire facility falls ill and requires medical treatment, or if something happens with an inmate at an employment site, this officer might have to leave the facility. At these times, a sergeant or the Warden herself might fill in as the rover.

The rover has too many duties to check on the holding cell every half hour, and actual checks are infrequent. When inmate G.G. was in the holding cell for three days, officers came to the cell only nine times a day. They came at each of the three shift changes, each meal, and each pill call. Due to the infrequency of checks, inmates are alone for the majority of the day.

Inmates in the holding cell have no way of communicating with officers in case of an emergency, and their communications with the Birmingham staff are limited to the periodic checks made by the rover. The cell is equipped with a video camera and a one-way intercom, monitored by the officer stationed at the central desk. The officer at the central desk can view inmates or speak to them through the intercom, but inmates have no way of responding to this officer, or of drawing her attention, other than waving their arms at the camera. In an emergency, there is

---

**6.** Mitchell will soon have the capacity to house "minimum in" inmates as well; these inmates are minimum custody, but do not have the privilege of leaving the facility.

no alarm button or other means of calling for help.

These deficiencies became all too clear on July 27, 2002, when C.M., an inmate in the holding cell, died. Up until her death, C.M. had been acting strangely, constantly "hollering" to herself and asking for her medication. At some point during the early morning hours of July 27, 2002, she became non-responsive. Upon being alerted to this fact, officers took a full 36 minutes to call 911. By the time paramedics arrived, C.M. was already dead from causes unknown at this time. The holding cell log indicates that no checks were made on the inmate from 3:00 a.m. to 4:30 a.m. Warden Carter stated in her deposition that the absence of checks concerned her because it indicated that "maybe an officer didn't do what she has in her log, saying that she did." No report was written following the incident until August 24, 2002, a full month later.

c. *Ventilation and Heat:* The conditions within Mitchell are essentially the same as those at Tutwiler. Inmates are housed in large open dorms; unlike inmates at Tutwiler, however, these inmates are free to move in and out of the dorms to get fresh air when they desire it. Mitchell is not equipped with air handlers, and there is no way to monitor temperature or humidity.

Each dorm at Birmingham has its own air handler and the facility is equipped with central air conditioning; therefore, ventilation should pose no problem at this jail. However, in July 2002, conditions at Birmingham were sufficiently uncomfortable to prompt inmates to make anonymous complaints to the Health Department. As a result of these complaints, the department inspected the facility and cited it for failing to ventilate the facility as required and for having an ambient air temperature between 91° and 92°. The Department of Health instructed Warden Carter to correct these conditions because they posed a health hazard to inmates.

In response to the complaints and the Health Department's citation, Warden Carter turned off the air conditioning and instead relied on fans to circulate air and cool the facility. This situation ended when Deputy Commissioner Glenn Newton circulated a memo, telling inmates that Warden Carter had agreed to turn on the air conditioning, with the thermostat to be set at 78°; the memo further warned, however, that should any more complaints be made to the Health Department, the air conditioning would be turned off, and the fans would once again be the only means of cooling the facility. Like Tutwiler and Mitchell, Birmingham is not equipped to monitor temperature and humidity. The defendants do not dispute that setting the thermostat at 78° does not necessarily result in an ambient air temperature of 78°.

## C. Institutional Measures and Other Litigation

The defendants in this case have attempted to implement multiple measures to deal with the various problems at Tutwiler, Mitchell, and Birmingham. Warden Deese has made yearly budget requests, asking for more staff, more holding cells, and additional facilities; but her requests for more funds have been rejected because of a lack of money. She has increased the number of programs available to inmates, concentrating on those programs that might reduce conflict; these classes include anger and stress management and healthy relationship courses. In addition, Warden Deese has made herself available to the inmate population, by regularly walking around Tutwiler, meeting with inmates, reading the requests that they submit to her, and meeting with dorm representatives who bring inmate concerns to

her attention. Warden Deese has also addressed the increase in conflicts at Tutwiler by encouraging officers to mediate inmate conflicts through counseling. Officers discuss with inmates whether they can continue to live together; if they can, inmates sign a "peace agreement," agreeing to leave one another alone and obviating the need to segregate the inmates. Finally, Warden Deese has placed an additional post in dorm nine and asked officers to work overtime to ensure that there are sufficient officers on duty to maintain security at Tutwiler.

In reaction to complaints about the heat, Warden Carter turned off the air conditioning in Birmingham and relied on fans for air circulation. She later agreed to turn on the air conditioning again, provided that inmates no longer made complaints to the Health Department. In reaction to the inmate's death in the holding cell, Warden Carter called for an investigation of the incident. At the time of this hearing, the investigation is still pending, and no disciplinary action has been taken.

Commissioner Haley has requested an increase in funding for the Department of Corrections every year that he has acted as commissioner; he has not, however, received an increase sufficient to address the overcrowding and understaffing at Tutwiler and Mitchell. He has also instituted non-custodial correctional measures to prevent more inmates from entering the Department of Corrections custodial facilities. These measures include work-release programs, expanded community-corrections programs, and increased reviews of inmates in the system to determine those eligible for community-corrections programs. Commissioner Haley is also involved in other litigation against the Department of Corrections, *Barbour County v. Haley*, civil action nos. 92–388–SH & 92–399–SH (Circuit Court Montgomery, Alabama), a state-court case in which

county jails have sued state corrections officials for failing to transfer state prisoners housed in county jails to the appropriate state facility. In that suit, Commissioner Haley has submitted a plan that will benefit inmates in this suit as well. Those provisions that will benefit female inmates include an increase in community-corrections programs and a staff increase for the Alabama Board of Pardons and Parole. The ten new officers assigned to the board will allow more cases to be heard each week, allowing, in turn, more inmates to be released on parole.

## III. DISCUSSION

### A. Substantial Likelihood that the Plaintiffs Will Ultimately Prevail on the Merits

#### 1. *Standard for Cruel and Unusual Punishment*

█ The Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment and prohibits the infliction of "cruel and unusual punishments." *Wilson v. Seiter,* 501 U.S. 294, 296–97, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991). The Eighth Amendment ban on cruel and unusual punishments applies to the "treatment a prisoner receives in prison and the conditions under which he is confined." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citations omitted). There is both an objective and a subjective component to a court's Eighth Amendment inquiry into the constitutionality of a punishment. *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324.

█ The objective component requires the court to determine whether the challenged deprivations are "sufficiently serious" to rise to the level of being unconstitutional. *Id.* To satisfy this component for their first claim, that they have been de-

prived of a basic human need, the plaintiffs must show that they have been denied the "minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). To state a "sufficiently serious" claim that a prison has failed to protect inmates from harm, the plaintiffs must show that the challenged conditions pose a "substantial risk of serious harm" to them. *Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977.

 If the plaintiffs satisfy the objective component of the court's inquiry, they then must satisfy the subjective component by showing that the defendants acted with "deliberate indifference" to the alleged violation. *Id.* at 834, 114 S.Ct. at 1977. For injunctive relief, the plaintiffs must show that the defendants were, at the time of the suit, "knowingly and unreasonably disregarding an objectively intolerable risk of harm and that they will continue to do so." *Id.* at 846, 114 S.Ct. at 1983. However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844, 114 S.Ct. at 1982–83.

### 2. *The Objective Component of the Court's Eighth Amendment Inquiry*

The plaintiffs divide their claim that the defendants have violated their Eighth Amendment right to be free from cruel and unusual punishment into two parts: (1) the plaintiffs claim that the defendants are deliberately indifferent to the denial of the plaintiffs' basic human needs of adequate ventilation at all three facilities and living space at Tutwiler and Mitchell; and (2) they claim that the defendants are deliberately indifferent to the substantial risk of serious harm posed to the plaintiffs by the conditions at Tutwiler and by Birmingham's segregation unit.

a. *The Plaintiffs' Eighth Amendment Right to Basic Human Needs:* The Supreme Court has held that depriving an inmate of "the minimal civilized measure of life's necessities" can constitute cruel and unusual punishment. *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). The deprivation must be of a "single, identifiable human need." *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991). "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* at 305, 111 S.Ct. at 2327.

 i. *Ventilation:* Various courts have found that inadequate ventilation can amount to an Eighth Amendment violation. *See, e.g., Ramos v. Lamm,* 639 F.2d 559, 569 (10th Cir.1980) ("[i]nadequate ventilation ... results in excessive odors, heat, and humidity with the effect of creating stagnant air as well as excessive mold and fungus growth, thereby facilitating personal discomfort along with health and sanitation problems"), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759 (1981); *Hoptowit v. Spellman,* 753 F.2d 779, 784 (9th Cir. 1985) ("lack of adequate ventilation and air flow undermines the health of inmates and the sanitation of the penitentiary ... violat[ing] the minimum requirements of the Eighth Amendment") (citations omitted); *McKinney v. Anderson,* 924 F.2d 1500, 1507 (9th Cir.1991) (constant exposure to high levels of cigarette smoke violated an inmate's Eighth Amendment rights), *vacated by,* 502 U.S. 903, 112 S.Ct. 291, 116 L.Ed.2d 236 (1991) (vacated and remanded for further consideration in light of *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)), *aff'd,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (affirm-

ing original holding). The plaintiffs claim that the poor ventilation in all three facilities, in tandem with the heat, rises to the level of a constitutional violation. In determining the adequacy of ventilation, the court may consider temperature. *Chandler v. Baird*, 926 F.2d 1057, 1064–66 (11th Cir.1991) (cold temperatures causing "extreme discomfort" could constitute an Eighth Amendment violation). Specifically, the court may consider the heat inmates must endure and the defendants' responses to the heat.

■ The court rejects this claim as the plaintiffs have not presented enough evidence for the court to find that the ventilation and heat problems are "sufficiently serious" to establish a constitutional violation. The plaintiffs have shown that the lack of air conditioning and ventilation during the hot Alabama summer, combined with a large inmate population, creates hot, humid, and uncomfortable conditions at Tutwiler and Mitchell. The testimony of inmates suggests that the fans and air conditioning do little to circulate air, and it appears that the defendants may not be adhering to facility protocol by providing adequate ice, water, and extra showers to inmates when temperatures rise above 90°. In addition, the court is concerned with the hot conditions in the segregation cells at Tutwiler, in which inmates wear heavier clothing and have less access to relief such as ice and fans. Extreme heat also seems to be an issue at Birmingham with recorded temperatures of 91° at the one facility with air conditioning.

While the lack of ventilation and heat are serious issues at Tutwiler, and possibly Mitchell and Birmingham, there is insufficient evidence in the record to find that the plaintiffs have shown a substantial likelihood of proving these issues rise to the level of a constitutional violation. In *Benjamin v. Fraser*, 161 F.Supp.2d 151, 160–165 (S.D.N.Y.2001), *aff'd*, 264 F.3d 175

(2d Cir.2001), the court granted prospective relief for a number of prisons' failures to provide adequate ventilation. It based its holding on the extensive testimony of an environmental health expert and other objective evidence, including observations, smoke tests, and air flow readings taken with a velometer at each facility. In order to assess properly the plaintiffs' ventilation claim, the court needs more technical information, akin to the evidence in *Benjamin*, regarding what constitutes an "adequate air exchange" and what specific conditions exist at each facility, including temperature, humidity, and the opportunities available to inmates to gain relief from these conditions. Until the plaintiffs provide such information, the court cannot find a substantial likelihood exists that they will meet the objective portion of its Eighth Amendment inquiry, and therefore, it will not grant preliminary injunctive relief at this time. If the plaintiffs desire, they may renew their motion for such relief when they can provide additional information to the court.

■ ii. *Living space:* The Eleventh Circuit has also recognized that prisons are required by the Eighth Amendment to provide inmates with "reasonably adequate . . . living space." *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985) (although prisoners must have adequate living space, the lower court was not clearly erroneous in finding that prison officials had not violated an inmate's Eighth Amendment rights when he was occasionally forced to sleep on a table or on a mattress on the floor), *cert. denied*, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). In *Moore v. Morgan*, the Eleventh Circuit upheld the lower court's finding that inmates' Eighth Amendment rights had been violated when they had "less than 15 square feet of living space after the size of the bunks [was] taken into

account." 922 F.2d 1553, 1555 n. 1 (11th Cir.1991). The lower court found that these conditions were "cruelly exacerbated by the fact that the inmates ... were not allowed outside of their cells for any activity." *Id.* Similarly, in *Mobile County Jail Inmates v. Purvis,* the Eleventh Circuit upheld a district court's finding of contempt when a county failed to correct unconstitutional conditions of overcrowding. 551 F.Supp. 92, 94 (S.D.Ala.1982), *aff'd,* 703 F.2d 580 (11th Cir.1983) (table). Inmates in the Mobile County Jail had an average of 27 square feet of space or less. *Id.* at 94 n. 1. Some inmates had only 23 square feet of space. *Id.* Finally, in *Maynor v. Morgan County,* the district court made a preliminary finding that conditions in a county jail violated the Eighth Amendment when inmates were forced to sleep on the floor under bunks, on the floor between bunks, on tables, and between tables. 147 F.Supp.2d 1185, 1186–87 (S.D.Ala.2001)

The plaintiffs argue that conditions at Tutwiler and Mitchell do not meet the minimum amounts of living space as suggested by the American Correctional Association (ACA), and have provided evidence regarding the lack of space between bunks. They have also offered inmate testimony stating that some inmates spend most of their time within the small confines of their beds. By all accounts, Tutwiler is greatly overcrowded and at its absolute maximum capacity. The court, again, is gravely concerned with these conditions.

Despite its concerns, the court is unable to find that the plaintiffs are substantially likely to succeed on the merits of this claim. The ACA standards are a guide and not determinative in assessing the constitutionality of the conditions in a prison. *Bell v. Wolfish,* 441 U.S. 520, 543 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447

(1979) (although recommendations from groups such as the ACA "may be instructive in certain cases, they simply do not establish the constitutional minima"). At this time, there is no evidence on the record specifying the amount of space each inmate is allotted. The court cannot ascertain how far below ACA standards the conditions at Tutwiler fall. The record is also bereft of evidence pertaining to the amount of time inmates remain in their dorms. *See Moore v. Morgan,* 922 F.2d 1553, 1555 n. 1 (11th Cir.1991) (upholding the lower court finding that overcrowding was exacerbated by the lack of opportunities for inmates to leave their cells). Though the evidence shows that some inmates have jobs, that some inmates attend school, and that all inmates have an opportunity to go to the exercise yard, there is no clear picture of either how many inmates sit idly on their beds or for how long. In addition, it appears that many inmates choose to remain on their beds out of fear of becoming involved in potentially violent disputes with other inmates. Part of the problem, therefore, may be relieved by improvements in security. Without knowing the amount of space each inmate has and the amount of time each inmate must spend within that space, the court cannot make an adequate assessment of this claim. Therefore, the court cannot find that the plaintiffs are substantially likely to prevail on this issue, particularly because these conditions may change with safety improvements.

 b. *The Plaintiffs' Eighth Amendment Right to be Free from Substantial Risk of Serious Harm:* Inmates have "a constitutional right to be protected from the constant threat of violence and from physical assault by other inmates." *Zatler v. Wainwright,* 802 F.2d 397, 400 (11th Cir.1986). "[H]aving stripped [inmates] of virtually every means of self-

protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). In order to succeed on a "failure to protect" claim and meet the objective component of the court's inquiry, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* Furthermore, "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Wilson v. Seiter*, 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991).

 i. *Safety at Tutwiler:* The court agrees with the defendants that the plaintiffs' allegations regarding overcrowding, open dorms, inadequate supervision, improper or inadequate classification, inmate violence, the availability of weapons, and the small number of segregation cells are not sufficiently serious on the current record, when considered separately and alone, to support a finding of unconstitutionality. For example, there is nothing necessarily unconstitutional with overcrowding itself; inconvenience does not violate the Eighth Amendment. Similarly, there is nothing inherently wrong with having only a few staff members supervise inmates; in a prison with single or double cells, a handful of officers may be able to guard hundreds of inmates appropriately. Furthermore, open dorms themselves are not unconstitutional, and officials may house inmates as they deem fit. The same can be said for classification; inmates are not entitled to a certain classification. *Cf. Sandin v. Conner*, 515 U.S. 472, 485, 115 S.Ct. 2293, 2301, 132 L.Ed.2d 418 (1995) (finding that due process does not protect an inmate's liberty interest in not being placed in segregation because segregation does not "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life").

The court does not hold that any one of the above circumstances, standing alone, necessarily violates the Eighth Amendment prohibition against cruel and unusual punishment. Rather, the court holds today that it is the combination of substantial overcrowding and significantly inadequate supervision in open dorms that deprives inmates of their "right to be protected from the constant threat of violence." *Zatler*, 802 F.2d at 400. In addition, other circumstances, such as improper classification, access to weapons, and the lack of adequate segregation units exacerbate the problem, as do the problems with the prison's ventilation and heat.

Most of the safety problem at Tutwiler is attributable to the failure of officials to guard the overcrowded open dorms properly. The Eleventh Circuit has found that failing to provide adequate security in dorms creates a substantial risk of serious harm to inmates. In *LaMarca*, the court upheld a grant of injunctive relief because the prison had failed to implement protective policies, such as regularly patrolling dorms. 995 F.2d at 1534, 1542. The Eleventh Circuit upheld the part of an injunction requiring the prison to patrol dorms and confinement areas regularly, ensure that patrols have clear views of the relevant areas, use and maintain metal detectors, conduct regular shakedowns, and discipline prisoners found in possession of contraband. *Id.* at 1543.

As previously noted, the open dorms in Tutwiler are severely overcrowded and undersecured. They are often filled with idle prisoners and bunk beds that obscure visi-

bility. Tutwiler is rarely staffed with the 16 officers considered necessary to ensure the safety of inmates, much less the full 23 officers needed to staff every post in Tutwiler. On a regular basis, a single officer is left to guard 221 inmates, 228 inmates, or 324 inmates. For these officers to rove a dorm, it is necessary that they leave other dorms empty and unguarded. Dorm eight is consistently left unguarded, though inmates are not yet classified and have no means of calling for help other than banging on the door. Inmates in dorm nine must climb on to a top bunk in order to visually locate an officer in times of distress. The 324 inmates in dorms one through four often rely on a single officer to secure their safety.

Jim Aiken, the plaintiffs' expert on correctional security, testified that in an environment like Tutwiler's, staff cannot protect against random and systematic violence and that understaffing allows inmates to prey on others without detection. The testimony of inmates bears out this contention. Inmates repeatedly testified that fights are constant and regularly go unreported. Inmates who do not want to become enmeshed in fighting or disputes spend most of their time on their beds to avoid trouble.

The defendants tried to refute the allegations that security is inadequate at Tutwiler. For instance, the defendants testified that officers were in the dorm, roving, at the time an inmate, B.P., was cut from her ear to her chin. This does not, however, demonstrate that the dorms are adequately staffed and that inmate violence at these levels is an inevitable occurrence; rather, it strengthens the position that officers charged with supervising such large open populations are unable to maintain order. The evidence shows that Tutwiler's rate of assault is extremely high, beyond levels considered normal in the harsh environment of a prison. The evidence further demonstrates that sometimes as many as three dorms, containing a total of up to 244 inmates, are left unattended. There is overwhelming evidence that the 228 inmates of dorm nine are supervised by a single officer the majority of the time, and that locating that single officer in times of distress is difficult for inmates. That two officers were roving dorm nine when B.P. was cut demonstrates merely that circumstances were not as bad as they could have been, not that Tutwiler is properly staffed. Security at Tutwiler is clearly and significantly inadequate, as the greatly overcrowded open dorms require more than a single officer to supervise inmates properly.

The failure to classify inmates properly also contributes to this unacceptably dangerous environment. "The degree of overcrowding in the particular facilities ... contributes to the breakdown of a rational classification system ... necessary in that facility in order to provide any semblance of protection from violence." *Mobile County Jail Inmates v. Purvis*, 551 F.Supp. 92, 94 (S.D.Ala.1982), *aff'd*, 703 F.2d 580 (11th Cir.1983) (table). As in *Purvis*, overcrowding has led to a breakdown of Tutwiler's classification system. In a seriously overcrowded environment such as this, inmates are placed wherever an empty bed is available, regardless of their classifications. This problem was one of the underlying causes leading to the incident involving T.B., the mentally ill inmate who, due to lack of space, was housed in dorm ten rather than the mental-health dorm, and severely beat an officer.

Inadequate classification also leads to problems with weapons and contraband. While the defendants noted that most of the contraband at Tutwiler consisted of extra clothing and make-up, the most dangerous items at Tutwiler are not defined

as contraband. Aggressive inmates have access to dangerous, everyday items. Inmates have been cut with disassembled safety razors and threatened with locks encased in socks and mop and broom handles, none of which are considered to be contraband. The availability of make-shift weapons, in the absence of proper classification and combined with overcrowding, adds to the risk to inmate safety.

Another problem at Tutwiler is the alarmingly high rate of assault. Tutwiler had the highest assault rate of all correctional facilities in Alabama in May 2002. In these crowded conditions, inmates have no space to retreat from conflicts and often fight for limited resources. Aiken testified that, in his experience, female institutions do not normally have higher rates of assault than male institutions. He stressed that this was an abnormality which indicates a serious breakdown of correctional management. Aiken further testified that prisoner-on-prisoner assault causes prisoners to focus on self-protection rather than their return to the community. The problem is compounded if a staff member is assaulted, as at Tutwiler. Inmates are left to believe that, if officers cannot protect themselves, they will certainly be unable to protect inmates. A "kill or be killed" mentality develops, where inmates ask themselves if they should attack other inmates so as to preempt potential attackers. Overcrowding at Tutwiler has led to a significant increase in assaults and an atmosphere in which inmates legitimately fear for their safety.

Finally, the small number of segregation cells contributes to the substantial risk of serious harm posed to inmates. Disruptive inmates who violate the rules are placed on a waiting list to go into isolation. Conversely, some inmates are released from segregation prematurely, without completing their sentences. Consequent-

ly, officers have no effective means of disciplining inmates. Though officers may write up inmates for disciplinary infractions, there is a delay between the act and the punishment. Inmates observe this situation and learn that, in effect, there is no penalty for breaking the rules.

Due to the combination of the above factors, the court finds that the plaintiffs have satisfied the objective component of the court's Eighth Amendment inquiry. The plaintiffs have shown to a substantial likelihood that they will be able to prove that conditions at Tutwiler, in particular, the considerable overcrowding in open dorms in conjunction with significantly inadequate supervision, pose a substantial risk of serious harm to inmates.

ii. *Safety at Mitchell:* The conclusion that the conditions at Tutwiler are unsafe does not apply to Mitchell. While Mitchell has an open-dorm population and while there are fewer supervisory officials than are needed, other circumstances warrant a different conclusion for this facility. The officers at Mitchell may survey the dorms from an elevated security post in each dorm, and, most importantly, Mitchell inmates are classified as either "community custody" or "minimum out." Thus, as would be expected, the court heard no evidence of serious safety problems at Mitchell.

iii. *Safety in Birmingham's Holding Cell:* The court cannot find a substantial likelihood that the plaintiffs will prevail on the merits of this claim. The death of one inmate in the holding cell is cause for serious concern. Evidence indicates that the holding cell was never meant to hold inmates, is inadequately monitored, and does not provide inmates with a means to alert officers to adverse events in the cell. *See, e.g., LaMarca v. Turner*, 995 F.2d 1526, 1534, 1542 (11th Cir.1993) (holding that inadequate guard-

ing may support a finding of unconstitutional conditions). There is also evidence that officers checked on the cell only nine times a day, rather than the facility-required 48 times. Nevertheless, this evidence does not support an Eighth Amendment violation. To be sure, the more a cell is checked, the safer the inmate is; but the court has no evidence that checking a segregation cell only nine times a day falls so far below accepted penalogical practice as to constitute a substantial risk of serious harm. The court has no evidence before it that this limited cell oversight has been a direct cause of harm to the plaintiffs, nor does it have any evidence that it contributed to the C.M.'s death. The cause of C.M.'s death is still· unknown. Because there is insufficient evidence on the record to establish that the conditions in Birmingham's holding cell rise to the level of unconstitutionality, the court cannot find that the plaintiffs have met the objective component of their claim.[7]

### 3. *The Subjective Component of the Court's Inquiry*

The plaintiffs having satisfied the Eighth Amendment's objective component on their claim that certain conditions at Tutwiler are unconstitutionally unsafe, the court now turns to the subjective component. The plaintiffs may prove the defendants were deliberately indifferent by demonstrating that they knowingly and unreasonably disregarded the risk of harm to inmates and will continue to do so. The defendants have not acted with deliberate indifference, though, if they have taken reasonable measures to alleviate the harm, even if the measures ultimately fail.

*Farmer,* 511 U.S. at 844, 114 S.Ct. at 1982–83.

The defendants acknowledge that they knew of the conditions at Tutwiler. There is also a substantial evidence that Warden Deese knew that these conditions posed a risk of serious harm to inmates. Deese stated in her affidavit that "Julia Tutwiler Prison for Women is over-crowded and under-staffed which is seriously jeopardizing the public's safety." She also stated in a budget request for fiscal year 2001–2002 that "the current facility is cramped and too small for proper care and security of inmates" and has stated on multiple budget requests that "security will be seriously compromised" without more officers. In addition, Commissioner Haley acknowledged in the hearing that Tutwiler's staff-to-inmate ratio created potential safety problems. Because the defendants knew of the serious risk of harm posed to inmates housed at Tutwiler, the court's only remaining inquiry is whether the defendants' responses to that risk were reasonable.

■■■ When prison officials are sued solely in their official capacities, the lack of funds available to them is not an adequate defense to a finding of a constitution violation on their part. Official-capacity lawsuits are, "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *see also LaMarca,* 995 F.2d at 1542 (An official-capacity suit should "be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity.") (emphasis in original) (citations omitted). The action is "against an entity of which an officer is an agent," and, hence,

---

7. This is not to say the defendants' actions were not negligent; but negligence does not establish a constitutional violation. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811, (1994) ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.").

the official's personal powers are not a consideration. *Id.* Therefore, the relevant issue to the court's subjective inquiry is the deliberate indifference of the responsible entity with respect to its powers; restraints on the actions of individual officials are not determinative.

For example, in *LaMarca*, a prison superintendent was sued in both his individual and official capacities for failing to protect an inmate from violence at the hands of other inmates. *Id.* In reviewing the injunctive relief granted by the lower court, the Eleventh Circuit found that the individual superintendent's deliberate indifference was not at issue; rather, the court focused on the historical deliberate indifference of the responsible entity. *Id.* at 1542. While the court did consider financial limitations in assessing the superintendent's individual liability, it did not do so in relation to injunctive relief. *Id.*

The state officials are sued here in their official capacities; therefore, the real parties in interest are the responsible entities: the Department of Corrections and, ultimately, the State of Alabama. Hence, the court's analysis of deliberate indifference is properly focused on the reasonableness of the State of Alabama's responses as limited by the State's powers.

Given that an official's individual actions as limited by budgetary concerns are not a defense to a constitutional violation, the court now looks at whether budgetary concerns are an adequate defense to a State's failure to redress a constitutional violation for which it is responsible; they are not. It is well-established that funding is not an excuse for constitutional violations. In *Harris v. Thigpen*, the Eleventh Circuit specifically stated that "a lack [of funds] ... will not excuse the failure of correctional systems to maintain a certain minimum level of medical service." 941 F.2d 1495, 1509 (11th Cir.1991). The court fur-

ther commented that it did "not agree that 'financial considerations must be considered in determining the reasonableness' of inmates' medical care" and rejected the idea that the lack of funds could be used by " 'poor states' to deny a prisoner the minimally adequate care to which he or she is entitled." *Id.* Furthermore, in *Moore v. Morgan*, the Eleventh Circuit held that "the lack of funds for facilities does not justify the maintenance of unconstitutional jail conditions," rejecting any cost arguments out of hand. 922 F.2d 1553, 1557 n. 4 (11th Cir.1991). Finally, in *Ensley Branch, NAACP v. City of Birmingham*, the appellate court, quoting Judge Frank M. Johnson, Jr., explained that " '[t]he Constitution does not put a price on constitutional rights, in terms either of time or money. The rights guaranteed by the Constitution are to be made effective in the present.' " 31 F.3d 1548, 1574 (11th Cir.1994) (quoting from Jack Bass, *Taming the Storm* 398 (1993)).

Here, the defendants urge the court to consider the reasonableness of each official's response with respect to his or her ability to act within budgetary constraints. In other words, the defendants ask the court to consider whether each official's response was reasonable given the lack of funds available to him or her. The lack-of-funds defense is common in prison suits, and precedent clearly establishes that this defense is available to officials only when they are sued in their individual capacities. For example, when evaluating the superintendent's personal liability for money damages in *LaMarca*, the Eleventh Circuit specifically considered whether "lack of funds contributed to the [challenged] condition." *Id.* at 1537; *see also Hale v. Tallapoosa County*, 50 F.3d 1579, 1584 (11th Cir.1995) (considering whether monetary restraints frustrated the defendant's good faith efforts to address violence in

the county jail when assessing his individual liability).

The defendants attempt to circumvent well-established circuit precedent by citing *Wilson v. Blankenship*, 163 F.3d 1284 (11th Cir.1998), and *Hale v. Tallapoosa County*, 50 F.3d 1579 (11th Cir.1995), for the proposition that financial restraints on the actions of individual officials are appropriately considered in official-capacity suits. These cases do not support this proposition. First, *Wilson v. Blankenship* involved a claim for damages against prison officials in their individual capacities. 163 F.3d at 1288 n. 5. The court, in noting that the defendants had no control over funding, was addressing whether the defendants in their individual capacities had qualified immunity from the suit, not the constitutionality of the defendants' inaction in their official capacities. *Id.* at 1289. Consequently, *Wilson v. Blankenship* is not relevant to the case at hand.

*Hale*, too, does not apply here. The court in *Hale* dealt with both the official and the individual liability of a sheriff in one discussion, rather than addressing these issues separately. In doing so, the court stated that the financial defense raised by the sheriff was an appropriate question for the jury. *Hale*, 50 F.3d at 1584 (citing *LaMarca*, 995 F.2d at 1536, 1538). Although the Eleventh Circuit discussed the sheriff's official and individual capacities at the same time, it does not follow that the financial defense applies in both situations. As discussed above, *LaMarca* clearly addresses financial considerations in the context of individual-capacity suits, not official-capacity suits. Furthermore, the Eleventh Circuit plainly held in *Thigpen* and *Moore* that the availability of funds was not an appropriate consideration in examining alleged violations of the Eighth Amendment by institutions. Clearly established circuit precedent cannot be overturned by a later three-judge circuit panel. *United States v. Smith*, 122 F.3d 1355, 1359 (11th Cir.1997) ("Under the prior panel precedent rule, we are bound by earlier panel holdings ... unless and until they are overruled en banc or by the Supreme Court."), *cert. denied*, 522 U.S. 1021, 118 S.Ct. 614, 139 L.Ed.2d 500 (1997). Therefore, this court will not take the discussion in *Hale* to mean that financial concerns are a defense to constitutional violations in official-capacity suits. Instead, the court will rely on clearly stated circuit precedent that financial considerations are not a defense when identifying a constitutional violation.

 Warden Deese and Commissioner Haley testified as to the various measures implemented in response to the conditions at Tutwiler. These measures include increased community-corrections programs, increased programs within Tutwiler, overtime worked by officers, inmate counseling, and requests for more officers. The court applauds the efforts taken by the defendants thus far as these are necessary components to rectifying the unsafe conditions at Tutwiler.

The defendants' efforts are comparable to those of the defendant in *LaMarca*. There, the district court found that Lambdin, the new superintendent of the prison in question, was a "dedicated public servant who is trying very hard to make GCI an efficient and effective correctional institute." *LaMarca*, 995 F.2d at 1542 (citation omitted). Lambdin was a new superintendent and not responsible for any of the unconstitutional conditions at the prison; furthermore, he had remedied these conditions to the point that inmates had "constitutionally adequate protection from violence." *Id.* Nevertheless, the Eleventh Circuit rejected Lambdin's argument that, because he had acted responsibly during his time as superintendent, the court could

not find deliberate indifference. The court upheld parts of the injunction entered against the prison on the grounds that Lambdin had not taken sufficient steps to ensure that the prisons' past wrongs would not be repeated. *Id.*

Like the superintendent in *LaMarca,* the defendants in this case are dedicated public servants who have acted to address problems at Tutwiler. Nonetheless, the court must still find deliberate indifference because the defendants' efforts simply do not go far enough; the measures they have taken have had negligible impact on the massive danger posed to inmates. Counseling and anger management have a limited reach in their effectiveness, as do overtime and prisoner release programs. As the court stated above, several factors together create the unconstitutional conditions at Tutwiler. The defendants' measures are superficial and only address some of the factors creating Tutwiler's dangerous environment.

While requests for more officers are a necessity in staffing Tutwiler adequately, the most obvious necessity is honoring those requests. The State of Alabama has plainly failed to provide Tutwiler with the staff it needs to ensure inmate safety. In the month of July, there were only two days in which 16 officers, the minimum number needed to protect inmates, were on duty. Filling staffing voids through the use of overtime can only do so much; officers working overtime tire and, ultimately, cannot compensate for the severe dearth of officers at Tutwiler. The defendants' response to this situation has been patently inadequate; if Tutwiler continues to run at its current inmate capacity, nothing short of additional staffing is a reasonable response to the facility's dire need for officers. In short, the measures taken by the defendants are a laudable step in the right direction, but they are fundamentally inadequate, unreasonable responses to the dangers posed by poorly guarded, overcrowded open dorms. Therefore, the court finds that the defendants were, and continue to be, deliberately indifferent to the substantial risk of serious harm posed to the plaintiffs and that the plaintiffs are substantially likely to succeed on this claim.

### B. Substantial Threat of Irreparable Harm

 Based on the facts alleged by the plaintiffs, the court concludes that a substantial threat of irreparable harm to women prisoners in the Alabama state prison system exists and will continue to exist if an injunction is not entered now. "The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." *Preston v. Thompson,* 589 F.2d 300, 303 n. 3 (7th Cir.1978); *see also Maynor v. Morgan County,* 147 F.Supp.2d 1185, 1189 (N.D.Ala.2001) ("[Plaintiffs] will suffer irreparable harm by virtue of Defendants' ongoing serious violations of their federal constitutional rights."); *Lee v. McManus,* 543 F.Supp. 386, 392 (D.Kan.1982) (same).

Here, the plaintiffs have made a preliminary showing that the defendants have failed to protect the plaintiffs and other women prisoners from a substantial risk of serious harm. Inmates are living in overcrowded and understaffed open dorms, where weapons are easily accessible and where weak prisoners are not separated from aggressive prisoners. The potential physical harm resulting from this situation would obviously be irreparable. Moreover, the risk of harm to inmates is not only a potentiality, but a reality. Inmates (and officers) have already been injured at these facilities. The second prong of the preliminary-injunction test is therefore satisfied.

### C. Threatened Harm to the Plaintiffs Outweighs Harm to the Defendants

The threat of harm to the plaintiffs clearly outweighs any harm that the preliminary injunction may cause the defendants. The plaintiffs are suffering and will continue to suffer as a result of the defendants' ongoing failure to protect them from the substantial risk of serious harm posed to them by conditions in Tutwiler. In contrast, the defendants will suffer no harm from providing sufficient staff and adequate facilities to reduce the risk of assault and harm to women prisoners. In fact, officers employed by the defendants face an extremely dangerous situation, and they, too, will benefit from injunctive relief.

The threat of harm to the plaintiffs cannot be outweighed by the risk of financial burden or administrative inconvenience to the defendants. *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir.1985) ("Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care and treatment for inmates.") (citations omitted). As discussed above, courts have repeatedly made clear that cost is not a defense to constitutional violations. "It should not need repeating that compliance with constitutional standards may not be frustrated by legislative inaction or failure to provide the necessary funds." *Newman v. Alabama*, 559 F.2d 283, 286 (5th Cir.1977) [8] (citations omitted), *rev'd in part on other grounds sub nom Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978).

### D. Service to the Public Interest By Entry of a Preliminary Injunction

The public interest is in no way served by the defendants' current policy, practice, and custom of incarcerating inmates in dangerous conditions. Rather, there is a strong public interest in requiring that the plaintiffs' constitutional rights no longer be violated, as well as in prevention of the foreseeable violence that will occur if present conditions persist. *See Preston v. Thompson*, 589 F.2d 300, 303 n. 3 (7th Cir.1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest."). Not only prisoners, but the safety of prison guards and the general public will be protected by a preliminary injunction. As Warden Deese stated in her affidavit, the prison is "overcrowded and under-staffed . . . seriously jeopardizing · the public's safety." The fourth element of the test for preliminary injunctive relief is therefore satisfied.

## IV. CONCLUSION

In sum, the court holds that the plaintiffs are entitled to preliminary-injunctive relief on their claim that they are subject to a substantial risk of serious harm caused by Tutwiler's greatly overcrowded and significantly understaffed open dorms. Indeed, the court is not only convinced that these unsafe conditions have resulted in harm, and the threat of harm, to individual inmates in the immediate past, it is also convinced that they are so severe and widespread today that they are essentially a time bomb ready to explode facility-wide at any unexpected moment in the near future. The plaintiffs are not entitled to preliminary-injunctive relief as to Mitchell and Birmingham, nor are they entitled to such relief as to Tutwiler in any other respect.

---

**8.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

The court recognizes that prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878–79, 60 L.Ed.2d 447 (1979). At this time, therefore, the court will give the defendants the latitude to fashion appropriate injunctive relief. The defendants may want to adopt the simple and direct measure of immediately and significantly increasing the number of security officers for Tutwiler's dorms or to find some way to reduce immediately the dorm populations or to pursue some other immediately effective measure unknown to the court at this time or to adopt some combination of these measures. The defendants are to submit, within four weeks, a plan that redresses immediately and fully the unconstitutionally unsafe conditions caused by overcrowding and understaffing in open dorms at Tutwiler.

An appropriate order and injunction will be issued.

### ORDER AND PRELIMINARY INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) The motion for preliminary injunction, filed by plaintiffs Linda Laube, Theresa Barron, Barbara Bush, Lachrondria Crockett, Marjorie Ewing, Wanda Goodman, Alma Gutierrez, Lisa Hereford, La'toya Jones, Katie Moore, Terri Newby, Barbara Pelzer, April Rice, Kelli Washington, and Melinda Washington on August 19, 2002 (Doc. no. 5), is granted as to the unconstitutionally unsafe conditions at Julia Tutwiler Prison for Women, as described in the companion memorandum opinion entered today, and the motion is denied as to Edwina Mitchell Work Release Center and Birmingham Work Release Center, and as to Julia Tutwiler Prison for Women in all other respects.

(2) It is PRELIMINARILY DECLARED that the unconstitutionally unsafe conditions, resulting from overcrowded and understaffed open dorms, at Julia Tutwiler Prison for Women violate the Eighth Amendment to the United States Constitution.

(3) Defendants Don Siegelman, Michael Haley, and Gladys Deese are PRELIMINARILY ENJOINED and RESTRAINED from failing to take immediate affirmative steps to redress the unconstitutionally unsafe conditions at Julia Tutwiler Prison for Women.

(4) The defendants are to submit to the court, by December, 30, 2002, a plan that redresses immediately and fully the unconstitutional conditions at Julia Tutwiler Prison for Women.

The clerk of the court is DIRECTED to issue a writ of injunction.